415 Mass. 787 (1993)
616 N.E.2d 52
JEAN M. deCASTRO
vs.
EDSON D. deCASTRO.
Supreme Judicial Court of Massachusetts, Worcester.
February 1, 1993.
July 13, 1993.
Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.
Richard D. Packenham for Edson D. deCastro.
Stephen C. Maloney (Michael S. Avratin with him) for Jean M. deCastro.
ABRAMS, J.
Edson deCastro, the husband, appeals from the judge's division of the marital property, specifically the division of stock in Data General Corporation (Data General). Jean deCastro, the wife, argues that she has been damaged by the husband's stay of that portion of the judgment *788 nisi of divorce which awarded her fifty percent of the Data General stock.[1] She also requests damages and attorney's fees on the theory that the husband's appeal is frivolous. We allowed the wife's petition for direct appellate review.
The judge entered findings of fact, a rationale and an order. We recite those facts pertinent to the appeal. The parties were married in Norwich, Connecticut, on November 16, 1963. The wife was a schoolteacher and the husband worked at Digital Equipment Corporation. They lived in Newton. For the first part of the marriage, the parties pooled their savings. In 1967, a daughter was born, and the wife discontinued her work. In 1968, the husband, with four others, formed a new company called Data General Corporation. The husband contributed $15,000 from the joint savings account to the start of Data General. The parties purchased a home in Southborough, in order to be close to Data General's headquarters.
Two other children were born, one in 1970 and the other in 1972. The wife remained at home, caring for the children and her husband. Data General was a successful venture, and the parties' life-style reflected that. The judge found that they owned the Southborough property, eight automobiles, an airplane, and a boat. The parties skied, generally spent one week each winter in a warm climate, and belonged to the Westboro Tennis Club.
In 1980, the husband became involved with another woman and left the marital home. The judge found that the husband did not want the wife to divorce him, and that the husband continued to visit, and occasionally spent the night. The judge also found that, during the years 1980 to 1986, the husband and wife had sexual intercourse on various occasions.
After the husband moved out of the marital home, the wife began to work as a librarian for the school department *789 of Thompson, Connecticut. The husband continued to pay the expenses of the households. He also paid family and education expenses. Since returning to employment in 1980, the wife has contributed all of her salary to the maintenance of herself and the children. In 1981 and 1982, the husband purchased land on Lake Winnepesaukee, Wolfeboro, New Hampshire, on which to build a vacation home for the wife. Since 1982, the wife and the children have spent most summers in Wolfeboro.
The husband, in his name, owns a significant number of shares in Data General. The judge included the following findings:
 April 16, 1968: Mr. deCastro acquired 315,220
 shares when Data General
 Corporation was formed
 January 4, 1974: Mr. deCastro purchased 100 shares
 when Data General went on the New
 York Stock Exchange
 February 15, 1980: Date of parties' separation, Mr.
 deCastro owned 315,320 shares
 November 8, 1983: Data General Common Stock split 2
 for 1 - As of November 8, 1983, Mr.
 deCastro owned 630,640 shares
 February 28, 1984: Mr. deCastro exercised stock
 options and purchased 207,666
 shares
 November, 1984: Mr. deCastro sold 50,000 shares of
 Data General to pay taxes, repay
 part of his loan to Data General
 and to have funds to exercise the
 June 19, 1985, option
 June 19, 1985: Mr. deCastro exercised stock option
 and purchased 59,000 shares of Data
 General
*790
 April 2, 1986: Mr. deCastro was granted the option
 to purchase 50,000 shares of Data
 General, which to date remains
 unexercised
 June 28, 1991: Mr. deCastro owns 847,306 shares of
 Data General and an option to
 purchase an additional 50,000
 shares at below market value.
The judge also considered the wife's contribution. He found that the wife assumed ninety percent of the responsibility for the physical and mental needs of the children. She was responsible for all cooking and care of the interior of the house, and for the maintenance of her car and those of the children. The wife was responsible for entertaining both her family and the husband's, and for purchasing gifts. The wife transported the children to school, athletic events, dancing school, music lessons and other events, arranging car pools when necessary. She also acted as the disciplinarian, setting and enforcing the rules. The wife was responsible for purchasing the children's clothing, the food, and any household necessities, and managed the money for these and other expenses. She attended ninety percent of the athletic events, parent-teacher conferences and other events, accompanied the children on college tours and spent all summers with them. In addition, she took them on several trips. The wife also was responsible for the religious and moral upbringing of the children. The judge concluded that: "Throughout the period of separation, the wife maintained a stable home atmosphere for the children by continuing good relationships with relatives, friends and neighbors. Because of such stability, the children are well-balanced, bright and athletic and never in trouble." The judge also noted that the husband was attentive to the children when his schedule permitted.
1. The division of the Data General stock. The husband challenges the judge's division of the Data General stock. He claims that the judge failed to consider all the factors in *791 G.L.c. 208, § 34 (1990 ed.),[2] and also to make appropriate findings. The husband also argues that the judge did not make the rationale for his decision regarding the division of assets implicit or explicit. We do not agree.
General Laws c. 208, § 34, gives the judge the discretion to "make a fair and just assignment of the spouses' property." Bianco v. Bianco, 371 Mass. 420, 422 (1976), quoting Inker, Walsh & Perocchi, Alimony and Assignment of Property: The New Statutory Scheme in Massachusetts, 10 Suff. U.L.R. 1, 4 (1975). This discretion is not unlimited. See Pare v. Pare, 409 Mass. 292, 296 (1991). In Bowring v. Reid, 399 Mass. 265 (1987), we outlined a procedure probate judges should follow in assigning property under G.L.c. 208, § 34. "[A] judge must make findings indicating that he has considered all factors relevant under § 34, and has not considered any irrelevant factors." Id. at 267. In reviewing a judge's decision under G.L.c. 208, § 34, we use a *792 two-step analysis. Id. We first determine whether the judge considered all the § 34 factors, and no others. Id. We then evaluate whether the conclusions follow from the findings and rulings. Id. Any conclusions the judge makes will be reversed only if "plainly wrong and excessive," but the judge's findings and rulings must make clear the reasons for these conclusions. Id., quoting Redding v. Redding, 398 Mass. 102, 107 (1986).
The husband claims that the probate judge issued findings of fact that were "woefully inadequate" with regard to the factor of contribution to the acquisition, preservation, and appreciation of marital assets. The husband contends that the Data General stock was the greatest single asset of the marital estate and that the judge failed to make findings, based on the evidence, as to the husband's revolutionary designs, the founding and developing of Data General, and the husband's unique role in the computer industry.
Under G.L.c. 208, § 34, "[t]he court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit." The judge considered the contributions of both the husband and the wife to the marriage. He found that "during the first three (3) years of the parties' marriage, the husband provided the majority of the financial contribution to the marital estate and that since 1967, the husband provided virtually all of the financial contribution to the marital estate but that the wife contributed almost all of the homemaking responsibilities and that since 1980 when she returned to work all of her salary has gone to family expenses." He also found that, after the separation, the wife maintained the stability of the family, and that, as a result of this, the children were balanced and successful.
The findings the judge made support the conclusion that he considered all of the factors required under § 34. The judge was not compelled to consider the husband's contributions to the computer industry in distributing the marital property. We conclude that the judge's findings with regard *793 to contribution to the marital estate were more than adequate.[3]
We next determine whether the judge's rationale makes clear, either expressly or implicitly, the reasons for his distribution of the Data General stock. See Bowring v. Reid, supra at 267. The husband argues that the rationale does not follow logically from the findings of fact or the underlying evidence heard at trial. He also claims that the judge did not apply existing case law properly to the facts of the case.
In his rationale, the judge noted that, in the first years of their marriage, both parties worked and managed to save $15,000, which the husband then invested in Data General. The judge acknowledged that, after 1967, the husband made all of the financial contribution to the family until 1980, when the wife reentered the work force and contributed her earnings to the maintenance of herself, the children, and their stations in life. The judge also explained: "From the beginning this [marriage] was a partnership in which both parties contributed to the raising of the children and to the accumulation of marital assets. Over the years their efforts became focused  hers on the home and the children  his on his work at the Corporation." The judge noted: "When the assets of this type of marriage are divided by a Probate Court, justice and equality require that both the financial contributions in the accumulation of these assets and the non-financial contribution in the raising of the children and taking care of the home must be taken into account."
*794 The husband claims that the judge's ruling with regard to the division of the Data General stock was plainly wrong and excessive and should be set aside. The husband asserts that the judge abused his discretion because his division of property did not reflect the "supercontribution" of the husband. The husband claims that the judge erred because he failed to make a finding about the husband's "genius." He suggests that his "genius" alone engendered the considerable estate.[4] The judge's rationale for the division of the marital property follows from the findings that both parties contributed to the marriage, one focusing on work outside the home and the other focusing on work within the home and with the children. The judge recognized that the contributions to the acquisition, preservation, and appreciation in value of the stock made by the wife were not quantifiable. He also recognized that the marriage had been a partnership, and that she had focused on the children and the home. The judge concluded that the wife made an equal contribution to the marriage. Therefore, the judge divided the Data General stock equally. The judge's rationale follows from his findings, which were based on ample evidence.
The husband's argument otherwise is simply a resurrection of the discarded idea that the wage earner is entitled to most if not all of the benefits of the paid work. Section 34 does not require the judge to limit his order to consideration of which party made the greater financial contribution to the acquisition of the assets. That narrow focus and analysis is precisely what the Legislature tried to avoid in § 34. The marriage-as-partnership concept, embodied in G.L.c. 208, § 34, recognizes that one party often concentrates on the financial side of the family while the other concentrates on homemaking and child care. Both parties contributed to developing a substantial marital estate, the husband by working at Data General and the wife by raising bright, happy, stable *795 children and caring for the home. "The concept of property assignment or equitable division under [§ 34] must be read to apply in a broad sense to the value of all contributions of the respective spouses towards the marital enterprise; it contemplates something more than determining which spouse's money purchased a particular asset" (emphasis added). Pare v. Pare, supra at 297, quoting Putnam v. Putnam, 5 Mass. App. Ct. 10, 15 & n. 6 (1977) ("Property division ... is based on the joint contribution of the spouses to the marital enterprise," quoting Inker et al., 10 Suff. U.L.R. 11).[5]
In sum, the judge correctly analyzed the marital estate under G.L.c. 208, § 34. He considered all the factors and did not consider any irrelevant factors. The husband's suggestion that his contributions to the computer industry should have been considered in dividing the marital property is unsupported by statute or case law. There was no error.[6]
2. The breadth of the stay. After the judgment, the husband moved in the Appeals Court for a stay of that portion of the judgment that ordered transfer of stock in Data General. *796 The motion was allowed. The wife did not appeal that order, but did move to modify it. The judge in the Appeals Court denied the motion, "without prejudice to arguing to the panel that hears the appeal the question whether the defendant should be liable to the plaintiff for losses allegedly resulting from the stay." The wife now asks that we allow her motion to expand the record on appeal to include stock market quotations indicating the prices of the Data General stock during the pendency of the stay. That motion is denied.
The husband argued that the wife contributed nothing to the stock acquired after the separation. The judge found that, on February 15, 1980, the date the parties separated, the husband owned 315,320 shares of Data General stock. The judge also found that on November 8, 1983, the 315,320 shares the defendant owned split two-for-one, for a total of 630,640 shares, 50,000 of which he sold to pay taxes, to repay to Data General a portion of a loan, and to liquidate enough funds for him to exercise a stock option on June 19, 1985. After the separation, the husband exercised stock options and purchased an additional 266,666 shares, 207,666 on February 28, 1984, and 59,000 on June 19, 1985.[7] The judge ordered the husband to transfer to the wife fifty percent[8] of the shares he owned.[9]
*797 The husband concedes that the majority of the shares he held in Data General were acquired during the marriage, and that he was concerned only with the transfer of 133,333 shares that he acquired after the separation. The stay the husband sought covered all of the stock. There was no error in staying the transfer of the 133,333 shares, but the transfer of shares purchased before the separation, and those resulting from the stock split, should not have been stayed. The wife asks that she be compensated for the decline in value, if any, resulting from the erroneous stay of the transfer of that stock. She asks us to extend the dictum in Huber v. Huber, 408 Mass. 495, 500 (1990), which stated: "If an appeal stays the effect of a portion of a judgment to pay over assets, consideration may be appropriate of imposing an obligation to pay interest if the party holding the assets should lose on appeal."
Jurisdictions that have considered the analogous situation of a wrongly issued injunction restraining the sale of stock have concluded that the measure of damages is the difference between the value of the stock on the date the injunction issued and the value of the stock on the date the injunction is dissolved. In Osage Oil & Ref. Co. v. Chandler, 287 F. 848 (2d Cir.1923), the United States Court of Appeals for the Second Circuit ruled that ownership of stock indicated a concomitant right to sell it. The court said that interference with this right to sell was a violation of a legal right and that "violation of a legal right imports damage." Id. at 851. The court concluded that "the one who sues out the injunction must suffer the pecuniary loss resulting therefrom, and not the person whose legal right was invaded." Id. at 852. Finally the court noted: "The party complaining must show, not only that he has suffered the loss, but also that it would not have been incurred but for the wrongful act of his adversary; *798 and the amount of the loss is as much to be proved by the plaintiff as the fact of the loss." Id. See Gibson v. Reed, 54 Neb. 309, 312 (1898) (party who had signed an injunction bond was liable for all damages resulting from the injunction, including the depreciation in value of corporate stock and of real estate); Slack v. Stephens, 19 Colo. App. 538, 543 (1904) (in suit on injunction bond, the court ruled: "The wrongful act of [the defendants] caused plaintiff to lose the value of his stock, the value of his stock exceeded the penalty of the bond, he was entitled in an action on the bond to recover such damage to the extent of the penalty of the bond"); Clay Center v. Williamson, 79 Kan. 485, 488 (1909) (In an action on an injunction bond, the court ruled: "The difference ... between the market value of the bonds when the injunction stopped the sale and their market value when the injunction no longer prevented a sale is the measure of one of its claims for damages, because it measures a loss which is the direct and proximate result of the injunction"); American Exch. Nat'l Bank v. Goubert, 210 N.Y. 421, 425 (1914) (discussing that obligation of signer of injunction bond was to pay damages resulting from the injunction, including any "impairment of the value of the collateral as a result of the injunction"); Leavitt v. Lusch, 192 Ill. App. 504, 506 (1915) (damages may be assessable on a theory of lost opportunity where "performance of a contract for sale of stock by the owner thereof is prevented and defeated by an injunction wrongfully sued out, and loss ensues from depreciation in its value or from inability thereafter to obtain as good a price"); but see Girard v. Moore, 86 Tex. 675, 677 (1894) (noting that decline in value of wrongfully garnished stock "is not a probable, if a possible, consequence of the garnishment; and no recovery can be had for the loss resulting from such depreciation, in the absence of evidence sufficient to show that but for the writ the loss would not have been suffered").
The husband conceded that he was contesting only the transfer of 133,333 shares of Data General stock he had purchased after the separation. He moved, however, for a stay of *799 transfer of all the shares the judge awarded to the wife. The stay should not have included the wife's portion of the shares purchased during the marriage or those resulting from the stock split. Therefore, we apply the reasoning of the cases concerning injunctions and rule that the wife is entitled to damages, if any, represented by the difference in value of that stock on the date the stay issued and the date of this opinion. See generally Osage Oil & Ref. Co. v. Chandler, supra at 851; Gibson v. Read, supra at 312; Clay Center v. Williamson, supra at 488. We remand this issue for a hearing on the damages, if any, to which the wife may be entitled.
3. Conclusion. We affirm the judge's division of the Data General stock. We rule that the stay was too broad and that it is dissolved as of the date this opinion is issued. We remand the case to the Probate Court for a determination of damages, if any, based on the difference between the value on the date the stay issued and the value on the date of this opinion of the Data General shares the transfer of which was erroneously stayed.[10]
So ordered.
NOTES
[1] The wife did not take an appeal from the allowance of the husband's motion by a single justice of the Appeals Court. She did move for modification of the stay, which the single justice ruled could be argued before the panel. See infra.
[2] General Laws c. 208, § 34 (1990 ed.), as amended, St. 1990, c. 467, effective March 29, 1991, provides in pertinent part: "Upon divorce or upon a complaint in an action brought at any time after a divorce, whether such a divorce has been adjudged in this commonwealth or another jurisdiction, the court of the commonwealth, provided there is personal jurisdiction over both parties, may make a judgment for either of the parties to pay alimony to the other. In addition to or in lieu of a judgment to pay alimony, the court may assign to either husband or wife all or any part of the estate of the other, including but not limited to, all vested and nonvested benefits, rights and funds accrued during the marriage and which shall include, but not be limited to, retirement benefits, military retirement benefits if qualified under and to the extent provided by federal law, pension, profit-sharing, annuity, deferred compensation and insurance. In determining the amount of alimony, if any, to be paid, or in fixing the nature and value of the property, if any, to be so assigned, the court, after hearing the witnesses, if any, of each party, shall consider the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. In fixing the nature and value of the property to be so assigned, the court shall also consider the present and future needs of the dependent children of the marriage. The court may also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit."
[3] The husband "acknowledges that the trial court ... nominally considered and made findings on all the statutory factors...." He asserts, however, that "under the heading of `Contribution to the Acquisition, Preservation and Appreciation of the marital assets ... the findings are hopelessly flawed when contrasted with the evidence...." We do not agree. That argument is based solely on the fact that, in the husband's view, the evidence of the husband's "genius" was not accorded sufficient weight by the judge. Because we reject the husband's claim that "genius" is a factor under § 34, we reject the husband's argument that the judge did not weigh the evidence correctly. We add that our reading of the record amply supports the judge's findings and rulings.
[4] The husband's argument could be made by any person whose ideas, skills, and judgment made that person highly financially successful in that person's business, industry or profession.
[5] The husband's reliance on Savides v. Savides, 400 Mass. 250 (1987), is misplaced. In Savides, the parties separated and discontinued any further marital relationship ten years prior to the divorce. The judge concluded that the wife made no contribution after the separation. That fact distinguishes this case from Savides. The judge found that the wife continued to care for the children and contributed her salary to the maintenance of herself and the children. In any event, we cannot conclude on this record that the judge was plainly wrong or excessive. See id. at 252-253.
[6] The husband relies on two cases in which courts recognized "genius." They are not persuasive. In Parrett v. Parrett, 146 Wis.2d 830 (1988), the Wisconsin Court of Appeals affirmed a judge's division of property in which the judge awarded 60% of the property to the husband and 40% to the wife. That case involved a short-term marriage with maintenance and child support also awarded.

In Lester v. Lester, 547 So.2d 1241 (Fla. App. 4th Dist. 1989), the District Court of Appeals of Florida, Fourth District, ruled that the wife's "services as a homemaker and her contribution to the marital estate [were] modest." Id. at 1243. The court noted that the judge described the wife's role as "that of an ornament." Id. Here, by contrast, the judge found the wife contributed extensively as a homemaker and that she was responsible for the children.
To the extent these cases are inconsistent with § 34 and our cases, we decline to follow them.
[7] There is no evidence of the date the options were acquired. The husband also owns an option to purchase an additional 50,000 shares at below market price.
[8] The judge categorized the stock owned depending on the date acquired. He then ordered the husband to transfer to the wife fifty percent of the stock from each category, in an attempt to equalize the tax consequences.
[9] The judge also found that the husband owed a debt to Data General of $2,176,036.93 and had pledged stock to support it. The judge divided the parties' money market account, which totaled $3,847,674.50, equally, but then required the wife to share in the debt. The judge divided the debt in half and noted that the husband would retain sufficient stock to meet the pledge to Data General. In lieu of a transfer of stock to cover the wife's share, the judge subtracted the amount she would owe from the money in the money market fund. He allocated that amount to the husband. The judge then divided the rest of the money in half. In his motion for stay of the judgment, the husband agreed to pay over the $835,818.80 due the wife from the money market account.

It appears that the judge valued the stock on a certain day and then substituted cash for a transfer of stock in order to pay the debt. We are unable to determine whether the stock that was so valued was part of the stock for which the stay was appropriate or part of the stock for which the stay was too broad. Thus, we are unable to determine whether the wife has had any loss of use of funds for which she should be compensated.
[10] We deny the wife's request for attorney's fees.