HALA YOUSIF *vs.* SAMIR GEORGE YOUSIF
(and a companion case[1]).

No. 02-P-487.

Norfolk. November 12, 2003. - August 25, 2004.

Present: DUFFLY, DREBEN, & KAFKER, JJ.

*Divorce and Separation,* Division of property, Appeal. *Practice, Civil,* Appeal,
Dismissal of appeal. *Trust,* Rescission. *Fiduciary.*

This court dismissed one aspect of the husband's appeal from a judgment of
divorce, subject to the husband's posting within sixty days of the issuance
of the rescript sufficient bond to secure that aspect of the judgment plus
accrued interest, where the husband was a fugitive in the sense that he was
not amenable to personal sanctions against him and his voluntary absence
from the jurisdiction was related to the proceedings at hand, where his
fugitive status impaired the wife's ability to collect on that aspect of the
judgment, and where no lesser sanctions were available that would address
this court's concerns about the enforceability of that portion of the judg-
ment; however, this court declined to dismiss the portion of the appeal
concerning an asset that was within the jurisdiction. [687-691]
In a divorce action, the judge properly ruled that a trust created by the husband,
as to which he was the trustee and which named as beneficiaries the
husband's sister and the parties' two children, was void because it was cre-
ated in violation of a fiduciary obligation which the husband owed to the
wife, in view of the particularities of their relationship. [692-698]

COMPLAINT for divorce filed in the Norfolk Division of the
Probate and Family Court Department on October 13, 1998.

[1]Hala Yousif *vs.* Samir George Yousif & others. An appeal by the husband
and his sister, Farida Yousif, from the judgment entered by the Probate Court
dismissing the wife's equity complaint has been combined with the appeal
from the divorce judgment. The husband also appeals from a contempt judg-
ment entered against him on two complaints for contempt. The divorce and
contempt actions were tried together in the Probate Court. The Probate Court
judge dismissed the equity complaint on the basis that it was unnecessary,
given the court's authority to make a disposition of marital assets in the
divorce action. The joint brief filed by the husband and Farida Yousif sets
forth no claim or argument with respect to either the dismissal of the wife's
equity action or the contempt judgment, and we therefore affirm those
judgments.

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on October 15, 1998.

The cases were heard by Eileen M. Shaevel, J., as were complaints for contempt filed on September 30, 1999, and November 11, 1999.

*Thomas B. Drohan* for Samir George Yousif & another.

*Stephen F. Murray* for Hala Yousif.

DUFFLY, J. Following trial, a judgment of divorce assigned to the husband, Samir George Yousif, extensive real estate holdings in Lebanon and ordered him to pay to Hala Yousif, his wife, the sum of $1,080,115 as her share of this real estate. The wife was also assigned all of the proceeds from the sale of the parties' residence in Walpole, which had been the sole asset in the Yousif Family Trust created by the husband. In the husband's appeal from the judgment, he makes two claims: (1) the trial judge erred in ruling that the trust was void ab initio because it had been established in violation of a fiduciary relationship; and (2) the trial judge abused her discretion in qualifying the wife's witness as an expert on the issue of the ownership and value of certain real estate in Lebanon. The wife challenges the husband's right to appeal and claims his appeal should be dismissed.

a. *Dismissal of the appeal.* Relying on *Sommer* v. *Monga*, 35 Mass. App. Ct. 761 (1994), cert. denied, 513 U.S. 1169 (1995), the wife requests that we dismiss the husband's appeal from the divorce judgment. The essential facts in support of the wife's claim are not disputed. The parties, who were married in Lebanon in 1984, were divorced by a judgment dated March 28, 2001, which awarded the wife sole custody of the parties' two children.[2] On that date, the husband was found in contempt for violating an injunction prohibiting him from selling his property in Lebanon as well as for failing to make child support

[2]The wife filed a complaint for divorce on October 13, 1998, and on that date obtained an order enjoining the husband from making any transfers of marital assets. During 1999, the husband sold, for $1,393,500, several apartment units in two building complexes he had developed in Lebanon. At the commencement of the divorce trial in November, 2000, the husband still owned nine units in Lebanon with a combined value of $1,974,690. He also owned two additional parcels of vacant land in Lebanon that had not been valued.

and other payments required by temporary orders. After the divorce judgment entered, the husband sought but failed to obtain a stay of the pending appeal. He nevertheless made almost none of the child support or other payments required by the divorce judgment, nor the $1,080,115 payment reflecting the wife's share of the value of the real estate in Lebanon, and was again found in contempt.[3] The wife argues that this contumacious behavior justifies dismissal of the husband's appeal.

It is within our discretion to order dismissal of an appeal by one who has flouted the orders of a court, but the violation of a court order from which an appeal is taken does not alone constitute a sufficient basis to impose such a severe sanction. Dismissals have most often involved cases in which a party appealing from a child custody order has kidnapped the child and fled the jurisdiction. See, e.g., *Henderson* v. *Henderson*, 329 Mass. 257 (1952) (defendant granted a thirty-day grace period to bring herself into compliance); *Ellis* v. *Doherty*, 334 Mass. 466 (1956) (thirty-day grace period); *Trupiano* v. *Trupiano*, 13 Mass. App. Ct. 1010 (1982) (dismissal outright). Contrast *Tolos* v. *Tolos*, 11 Mass. App. Ct. 708 (1981).

In *Sommer* v. *Monga*, 35 Mass. App. Ct. at 762-763, a case that did not involve child kidnapping, the defendant Monga, a member of the Massachusetts bar, appealed from a civil judgment against him in the amount of $478,904.03. Despite a post-judgment order prohibiting him from transferring assets, Monga fraudulently conveyed assets to third parties, concealed assets, and mingled his personal assets with those of his corporation. After Monga failed to appear for a hearing on a motion for contempt, a capias issued for his arrest which, as of the date the appeal was heard in this court, remained outstanding. We stated: "Monga's actions placed recovery of the judgment in jeopardy and amounted to a flouting of the judge's orders . . . . In addition, with the capias for his arrest outstanding, Monga's position is analogous to that of a fugitive in a criminal case who, by

---

[3]As of March 29, 2002, the date of a second contempt judgment, the husband had failed to pay the $1,080,115 as well as $60,000 in attorney's fees, $28,020 in child support arrears, and court-ordered expenses related to the marital residence. The husband has not appealed from the 2002 contempt judgment.

his flight, has rendered the court powerless to enforce its orders against him." *Id.* at 764-765. See *Henderson* v. *Henderson*, 329 Mass. at 258. We concluded that we would dismiss the appeal unless Monga, within a sixty-day grace period, surrendered on the capias and purged himself of the contempt. *Sommer* v. *Monga*, 35 Mass. App. Ct. at 765.

As the United States Supreme Court observed in a 1996 decision discussing the doctrine of fugitive disentitlement in a civil forfeiture case, "[t]he dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." *Degen* v. *United States*, 517 U.S. 820, 824, 828 (1996) (describing the purposes advanced by disentitlement as enforceability of a judgment, redress for the indignity visited upon the courts by an appellant's absence from the proceeding, and the need to deter flight). The Court reversed the dismissal, stating that even an appellant's fugitive status does not always compel "the harsh sanction of absolute disentitlement." *Id.* at 827. See *Matsumoto* v. *Matsumoto*, 171 N.J. 110, 128 (2002) (fugitive disentitlement doctrine is appropriate "so long as the party's fugitive status is sufficiently connected to the litigation in which the doctrine is sought to be invoked and so long as nothing less than dismissal will suffice"). See also *Walsh* v. *Walsh*, 221 F.3d 204, 216 (1st Cir. 2000), cert. denied, 531 U.S. 1159 (2001) (barring appeal is too harsh a sanction "in the absence of any showing that the fugitive status has impaired the rights of the other [party]"). Compare *Goya Foods, Inc.* v. *Unanue-Casal*, 275 F.3d 124, 129 (1st Cir. 2001), cert. denied, 537 U.S. 1002 (2002) (discretionary dismissal is warranted where the underlying conduct is "extremely serious," the flight grew directly out of efforts to enforce the judgment, and "the appeals [were] themselves little more than devices to frustrate and delay the enforcement of the original judgment").

The foregoing cases provide guidance in determining when to dismiss an appeal filed by one who is in contempt for failing to pay the judgment appealed from. We have considered the following factors in deciding if the husband should be foreclosed from review of his claims: (1) whether he is, at least construc-

tively, a fugitive and his fugitive status is connected to the judgment appealed from; (2) whether the husband's fugitive status impairs enforceability of the judgment; and (3) whether lesser sanctions are available that would address the court's concerns. We do not suggest that each of the foregoing factors must be present before dismissal will be appropriate, nor that other factors may not also be weighed, such as whether the appeal is itself a device to frustrate and delay recovery.

In this case, the husband has repeatedly failed to make the court ordered payments, has been found in contempt for this failure, and at the time of oral argument remained in contempt. In addition, the husband has apparently removed himself from the court's jurisdiction.[4] The wife's motions for alternative service upon the husband and for service by publication, filed in connection with the complaints for contempt, were allowed by the Probate Court, and the wife's affidavit states that the husband resides exclusively in Lebanon. On this basis, we conclude that the husband is a fugitive in the sense that he is not amenable to personal sanctions against him, and that his voluntary absence from the jurisdiction is related to the proceedings at hand.

We next consider whether the husband's fugitive status has so seriously impaired the wife's ability to collect on the judgments in her favor that the sanction of dismissal of his appeal is warranted. The husband's appeal concerns two separate aspects of the divorce judgment, the money judgment of $1,080,115 and the order concerning the former marital residence.[5]

There is nothing in the record to suggest that the judgment ordering the husband to pay the wife $1,080,115 "as her share of the property he owns in Lebanon" can be secured by assets within the Commonwealth. The Probate Court's findings reflect that the husband has not had a bank account in his name in the

---

[4]It may be inferred from the record that the husband did not personally appear at any of the hearings subsequent to the divorce trial.

[5]Although the appeal was from the divorce judgment in its entirety, the husband's claims on appeal relate solely to property distributions to the wife. We affirm those aspects of the judgment as to which the husband's brief makes no claim or argument.

United States since 1985.[6] Although he apparently receives Social Security benefits, which have from time to time been attached to pay child support arrears, these payments are not sufficient to secure compliance with the $550 per week support order, let alone the judgment of $1,080,115. The husband's voluntary absence from the Commonwealth renders the enforceability of the judgment highly unlikely. We therefore dismiss the appeal from this aspect of the judgment unless within sixty days from the date of the rescript, the husband posts a bond sufficient to satisfy the full amount of the $1,080,115 judgment plus accrued interest. See *Matsumoto* v. *Matsumoto*, 171 N.J. at 131. If the husband fails to post such a bond, the appeal will not be permitted to proceed. *Sommer* v. *Monga*, 35 Mass. App. Ct. at 765.[7]

The husband's appeal from the order voiding the Yousif Family Trust concerns an asset (the parties' former marital residence in Walpole, and the proceeds from its sale[8]) that is within the jurisdiction, and hence his absence has not impaired the wife's ability to collect on this aspect of the judgment. See *Degen* v. *United States*, 517 U.S. at 825. See also *Matsumoto* v. *Matsumoto*, 171 N.J. at 135. Exercising our discretion, we decline to dismiss the husband's appeal from the judgment voiding the Yousif Family Trust.

---

[6]The Probate Court found that in 1985, the Internal Revenue Service conducted an audit of the husband for nonpayment of taxes. Thereafter, he maintained no individual bank accounts within the United States but transferred his money into accounts outside of the United States or in the name of his sister, Farida Yousif.

[7]We think, however, that the husband's claim is doubtful. He argues on appeal that the trial judge abused her discretion in qualifying the wife's witness as a real estate expert. There was no direct challenge to the witness's qualifications at trial, and the husband failed to offer any testimony upon which the judge could have come to a different conclusion on the value of his real estate holdings in Lebanon. See *Baccanti* v. *Morton*, 434 Mass. 787, 803-804 (2001); *Feathler* v. *Feathler*, 33 Mass. App. Ct. 924, 925 (1992).

[8]During the divorce proceedings, the Probate Court appointed an independent trustee to sell the marital residence. After it was sold for $560,000, further orders permitted the wife to use half of the proceeds to purchase a home in Foxborough, temporarily to be held in a newly established trust which named the children as beneficiaries. The balance of the proceeds were held by the independent trustee until trial concluded. The divorce judgment ordered that the proceeds and the Foxborough residence be transferred to the wife and that the trust be terminated.

b. *Rescission of the trust.* The Probate Court judge issued detailed and extensive findings supporting her decision that the trust created by the husband, as to which he was the trustee and which named as beneficiaries his sister Farida Yousif and the parties' two children, was void because it was created in violation of a fiduciary obligation which the husband owed to the wife, in view of the particularities of their relationship.[9]

We take our facts from the Probate Court judge's findings, which are not challenged by the husband. In 1984, when the wife met the husband, he was fifty years old and she was an eighteen year old high school student living with her mother in Lebanon in impoverished circumstances and an atmosphere of fear due to the civil war. The wife's family had been robbed, and getting enough food was difficult. Her uncle had been kidnapped and killed and her father, whose religious beliefs were not shared by those in political power, left the family because he feared for his safety. The husband promised the wife that if she agreed to marry him, they would move into a beautiful home in the United States, where she would live a "Dynasty life," and that she could return to Lebanon every three months to visit her family. He showed her two properties he owned in Lebanon. He had been married twice before, he said. He needed to leave for the United States in order to help his brother with the family business, George's Discount, located in Dorchester.

The parties were married on August 12, 1984. It was the wife's first marriage. Contrary to what he had told the wife, it was the husband's fourth marriage. Following a honeymoon at a resort in the mountains of Beirut, the parties moved to the United States.

The wife would not return to Lebanon for nearly ten years. There was no beautiful home and no lavish lifestyle awaiting

---

[9]To the extent that Farida Yousif sought, by her appeal from the judgment dismissing the equity complaint, see note 1, *supra*, to protect any interest she may have had as a beneficiary of the Yousif Family Trust, her brief makes no claim or argument respecting that interest. Any such claim would likely have failed, as there is nothing in the record to indicate that she changed her position in reliance on the creation, or was an innocent beneficiary, of the trust, or that she contributed any funds to the acquisition of the land or construction of the house. See Restatement (Third) of Trusts § 12 comment a (2003). Cf. *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 546 (1997).

her in the United States. At first, the husband and wife lived with the husband's brother, his wife and baby. They soon moved to a one-bedroom apartment in Quincy where they lived for seven years. During that time, the wife gave birth to two children: a son, on June 13, 1985, and a daughter, on September 4, 1987. For the first three years of her new life in the United States, the wife was not permitted to leave the apartment while the husband went to work at George's Discount, which he did six days a week, from 7:00 A.M. until 8:00 or 9:00 P.M. The wife could not speak English (she eventually taught herself to speak English by watching television) and the husband told her not to leave the apartment, because he said there was "a black man waiting outside the door" to cut her throat. She was rarely permitted to call her family in Lebanon, and when she did, the husband remained on the telephone listening to her conversation. The husband brought home food that the wife was to cook for his meals and only occasionally, after she begged to go outside, took her food shopping with him. Because the wife had been inside for weeks at a time, when she did leave the apartment, the daylight hurt her eyes. The wife was responsible for all of the household chores. The husband rationed the coins he gave her to do the laundry, becoming angry when she did too many loads. The husband rarely gave her any other money, and on the few occasions when he did, she was required to give an accounting. The wife and the children had little new clothing while the husband spent lavishly on himself, wearing expensive clothing and jewelry and driving expensive cars.[10]

In addition to these indignities, the husband physically and verbally abused the wife throughout the marriage. He often pulled her hair, slapped her face, hit her head with sufficient force to cause her neck to jerk, and hit her on the head with a rolling pin so that permanent bumps formed. He used a combination of physical violence, threats of physical violence,

_____

[10]He purchased a new 1986 Mercedes Benz 300E automobile and a new 1989 BMW 735i. Between 1994 and 1997, the husband also owned at least three additional Mercedes Benz automobiles in Lebanon. He furnished and maintained a spacious, two-level apartment in Lebanon. In 1998 and 1999, the husband underwent two procedures for hair restoration in Boston, for a total cost of $15,835, which he paid in cash.

and deceit, as well as total control over the family finances, to maintain power and control over the wife.

In addition to the household chores, the wife was solely responsible for child rearing throughout the marriage, as the husband, who spent little time with the family, showed no affection toward or interest in the children or their education or activities. She also contributed to the building and maintenance of the marital residence in Walpole by maintaining the records during construction; making all minor repairs left undone by contractors; and performing yard work, shoveling, and decorating. After the husband purchased Sam's Texaco, an eight-pump gas station and inspection facility in Hanover, for $60,000 in June, 1991, he forced the wife to work there with him. As the husband spent increasingly more time on his real estate business in Lebanon, the wife was left alone to run the gas station. She was responsible for purchasing and pumping gas, inspecting cars and giving out inspection stickers, changing oil, and changing and repairing tires. The Texaco station was sold in 1997 for $75,000; of this amount, $60,000 was transferred to Lebanon. In addition, beginning in 1992, the wife served as the husband's driver for up to six hours a day during a four-year period when he lost his driver's license.

On December 6, 1990, the husband signed a purchase and sale agreement for vacant land in Walpole (the property), on which he planned to build (and soon after the purchase did build) a residence. The $65,000 purchase price was paid from marital funds, and the husband expended between $160,000 and $200,000 more in marital funds to construct a house on the property.[11] On January 17, 1991, the property was conveyed to the Yousif Family Trust (trust).

---

[11]We reject as groundless the husband's claim — made in his recitation of the facts without citation to relevant authority — that the finding that the lot was purchased and construction financed by "marital funds" was without basis.

The husband asserts in his brief that he purchased the residence "with his personal funds," and that the judge made no finding that the wife "contributed her personal funds to the purchase of the lot or the construction of the home." The judge was not required to make such a finding. *Baccanti* v. *Morton*, 434 Mass. at 791-792. The Probate judge's findings detailed the wife's contributions as the primary parent and homemaker, her specific contributions to the building and maintenance of the residence, and the numerous other tasks she

The trust was created by the husband on December 6, 1990, the same date that he signed the purchase and sale agreement for the vacant land. On that date, he took the wife to the office of an attorney and, as he stood over her, told her to sign papers that were on a table. When she asked what she was signing, he raised his hand in a threatening gesture. When they left the office, the husband berated the wife for embarrassing him at the attorney's office and told her he had put the Walpole property in her name to make her "human." It was not until after she filed for divorce eight years later that the wife learned that the document she had signed did not put the property in her name. Rather, the document purported to establish the Yousif Family Trust, and she had signed over the words "successor trustee." According to this document, the husband was trustee, his sister, Farida Yousif, was a fifty percent beneficiary, and the parties' children were beneficiaries of the remaining fifty percent.

The wife and the children accompanied the husband to Lebanon on three occasions, in 1994, 1997, and 1998. During the 1998 visit, which occurred over several months, the wife was allowed to see her family for only one hour, and the children were forbidden from visiting them altogether. Upon her return to the United States, the wife filed for divorce and sought and obtained an abuse prevention order against the husband.

These uncontroverted facts amply support the Probate Court judge's ultimate finding "that a fiduciary relationship existed between the husband and the wife and was violated by the husband when he placed the marital home in trust, effectively eliminating the wife's interest."

We recognize that "a confidential relationship does not arise merely by reason of family ties." *Collins* v. *Huculak*, 57 Mass.

---

performed in connection with the house and the husband's business. See *Bianco* v. *Bianco*, 371 Mass. 420, 422-423 (1976); *Loud* v. *Loud*, 386 Mass. 473, 474-475 (1982). See also *Hay* v. *Cloutier*, 389 Mass. 248, 254 (1983); Ginsburg, M.G.L. c. 208, § 34 — Some Observations About the Division of Property Leading to Predictability and Consistency, 25 B.B.J. No. 1, at 10 (1981).

"The husband's argument . . . is simply a resurrection of the discarded idea that the wage earner is entitled to most if not all of the benefits of the paid work. Section 34 does not require the judge to limit his order to consideration of which party made the greater financial contribution to the acquisition of the assets." *deCastro* v. *deCastro*, 415 Mass. 787, 794 (1993).

App. Ct. 387, 394 (2003), quoting from *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 193 (1999). The existence of a fiduciary relationship is a question of fact and "may be found on evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters." *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 444 (1980) (where aunt "had the utmost trust and confidence" in nephew and relied on his "judgment and integrity in committing to him the management of her securities"). See *Sullivan* v. *Rooney*, 404 Mass. 160, 163 (1989) (fiduciary relationship between parties engaged to be married exists where "plaintiff was less educated [a high school graduate] and less experienced [she is a waitress] than the defendant [a career army officer attending law school at the time of the purchase of the house]" and plaintiff "relied on him over a long period in important matters"). Nothing in these cases suggests that upon appropriate evidence, a fiduciary relationship cannot be found to exist between married parties.[12] That evidence was present here and there was no error in the judge's conclusion that the husband owed the wife a duty of honest advice and full disclosure in

---

[12]Other jurisdictions holding that a fiduciary relationship is created where the evidence establishes that a spouse has dominion over another with regard to the transaction at issue include: *Vai* v. *Bank of Am. Natl. Trust & Sav. Assn.*, 56 Cal. 2d 329, 337-38 (1961) (where husband controls and manages the community property, his duty to remain a fiduciary of his wife's interest in the community assets continues until a division of property is made); *Edwards* v. *Miller*, 61 Ill. App. 3d 1023, 1027 (1978) (confidential relationship exists where the parties maintained a close relationship "indistinguishable from a husband-wife relationship save for the absence of a marriage certificate" for seventeen years, where defendant was the dominant party and plaintiff entrusted defendant with financial affairs); *Horwitz* v. *Horwitz*, 16 S.W.3d 599, 603 (Mo. App. 2000) (whether a fiduciary relationship exists between husband and wife depends on whether one party has dominion over the other in regard to the transaction involved); *Unser* v. *Unser*, 86 N.M. 648, 650 (1974); *Christian* v. *Christian*, 42 N.Y.2d 63, 72 (1977); *Link* v. *Link*, 278 N.C. 181, 193 (1971); *Dunkin* v. *Dunkin*, 162 Or. App. 500, 507-509 (1999); *Howell* v. *Davis*, 43 Tenn. App. 52, 58-60 (1957). Compare *McDonald* v. *Barlow*, 109 Idaho 101, 105 (1985) (fiduciary duty arising from the parties' marital relationship was not affected by the parties' separation but continued throughout the property settlement negotiations); *McClamroch* v. *McClamroch*, 476 N.E.2d 514, 520 (Ind. App. 1985) (a "husband-wife relationship raise[s] a presumption of trust and confidence on the one side and a corresponding influence as to the dominant party on the other").

connection with transactions related to the marital residence.[13]

The judge's subsidiary findings support her conclusion that the purported trust was created in violation of the husband's fiduciary duty to the wife. Where a relationship of trust and confidence is found to exist, "the law . . . provides a remedy against one who abuses the confidence reposed in him by another, turning it to his own advantage." *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. at 443. Cf. *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 27 (2002), quoting from *Rosenberg* v. *Lipnick*, 377 Mass. 666, 673 (1979) (parties to an antenuptial agreement stand in a confidential relationship and "[f]ull and fair disclosure of each party's financial circumstances is a significant aspect of [their] obligation to deal with each other 'fairly and understandingly' "). Taking advantage of her reliance on his experience in financial affairs, and his dominion over her, the husband obtained the wife's signature on papers that she believed gave her an interest in the land which had been purchased with marital funds. The husband's actions effectively denied the wife an interest in marital property, placing that property beyond her control. That the husband benefitted from the transaction is supported by findings that he historically used bank accounts in his sister's name as a repository for cash over which he retained dominion and control. See *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 535 (1997) (a fiduciary is liable for the breach of his duty either where he benefits directly or where the benefits flow to a third party or to another entity under the fiduciary's control). Cf. *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, *supra* at 440-441 ("where a person is induced to sign a legal document by one standing in a fiduciary relation to that person and where the fiduciary has an interest in the document's execution . . . the document can generally be avoided by its signer on a showing merely that the fiduciary failed to make him aware of the legal significance of

[13]On these facts, we need not be concerned with the absence of "the presumption of impropriety" in a family setting. *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. at 443 (in a fiduciary relationship "where there is also a relationship of family or friendship, gifts or other acts of generosity are natural and to be expected[, and] the reason for the presumption of impropriety dissolves").

the signing of the document, provided that the rights of innocent third persons have not intervened").

It makes no difference on the facts of this case that the wife was not told until after she signed the document that she had been given an interest in the land, or even that she signed any documents at all. Because of the fiduciary relationship between the parties, the husband owed a duty greater than that which generally exists between a husband and wife with respect to the acquisition and disposition of assets acquired during the marriage. The wife had acquired a protectable interest in marital funds that were used by the husband to purchase the land and construct a house on it. He held the funds and the land subject to a constructive trust for the benefit of the wife. *Sullivan* v. *Rooney*, 404 Mass. at 163-164. Thus, it was proper for the Probate Court to void the trust.

c. *Conclusion.* For the foregoing reasons, the judgment of divorce is affirmed. The wife's request that we award her attorney's fees and costs related to this appeal is allowed. The parties are to follow the procedure set forth in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004). The wife is to file appropriate supporting documentation with the clerk of this court within fourteen days of the date of rescript; the husband shall file his opposition within ten days thereafter.

*Judgment affirmed.*