5 A.3d 79

**Nancy E. LASATER**

v.

**John S. GUTTMANN, Jr.**

**No. 2364, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 13, 2010.

---

**33.** In the record, there are checks showing as much as $73,000 in tuition payments to Koba for just a single month.

432

434

John J. Condliffe (Shub–Condliffe & Condliffe, on the brief) Towson, MD, for appellant.

Joseph P. Suntum (Maury S. Epner, Miller, Miller & Canby, Chtd., on the brief) Rockville, MD, for appellee.

Panel: EYLER, DEBORAH S., MEREDITH and PAUL A. HACKNER, (Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Nancy E. Lasater, the appellant, and John S. Guttmann, Jr., the appellee, were married in 1980. Twenty-five years later, on August 30, 2005, Lasater sued Guttmann, in the Circuit Court for Montgomery County, for conversion, intentional infliction of emotional distress, breach of fiduciary duty, and

fraud. The tort claims were premised largely upon Gutt-mann's alleged financial malfeasance during the marriage.

Soon thereafter, on November 14, 2005, Guttmann filed for divorce, also in the Circuit Court for Montgomery County. Then, in the tort case (the case at bar), he moved for a stay for the pendency of the divorce action. The motion was granted.

The parties were divorced on November 15, 2007. The stay was lifted in the case at bar and Guttmann moved to dismiss or, in the alternative, for summary judgment as to all counts. Lasater filed a cross-motion for partial summary judgment. The court granted Guttmann's motion in its entirety and denied Lasater's motion.

Lasater appeals from that ruling, posing 13 questions for review, which we have consolidated and rephrased as four:

I.    Did the circuit court err or otherwise abuse its discretion in staying the tort suit during the pendency of the divorce case?

II.   Did the circuit court err in granting summary judgment on the conversion count?

III.  Did the circuit court err in granting summary judgment on the intentional infliction of emotional distress count?

IV.   Did the circuit err in granting summary judgment on the fraud and breach of fiduciary duty counts? [1]

---

1.  The questions presented, as worded by Lasater, are:
    1.  Did the Circuit Court err in staying this first-filed tort case because Appellant's husband, Appellee, months later filed for divorce?
    2.  Did the Circuit Court err in granting Appellee summary judgment after denying Appellant the right to any discovery?
    3.  Did the Circuit Court err in disposing of this case on the ground that Appellee's later-filed divorce extinguished these tort claims?
    4.  Did the Circuit Court err in denying Appellant's cross-motion for partial summary judgment on five key issues?
    5.  Did the Circuit Court err in granting summary judgment on all counts on statute of limitations grounds?
    6.  Did the Circuit Court err in dismissing Count I, Conversion?

For the reasons that follow, we answer all four questions in the negative and therefore shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Both Lasater and Guttmann are lawyers. For the duration of their marriage, Guttmann practiced law at a large firm in Washington, D.C. He was a partner at the firm and for some period of time was the firm's managing partner. Lasater practiced law until 2000; in 2002 she stopped working to stay home full-time with the couple's two children, a daughter born in 1995, and a second daughter born in 2000.[2]

According to Lasater,[3] throughout the parties' marriage, until 2003, Guttmann "alone ran every aspect of the family's finances." The couple held a joint checking account ("Joint Checking Account") into which both of their incomes were supposed to be deposited each month.[4] Each spouse wrote checks on this account. The monthly statements were mailed

---

7. Did the Circuit Court err in also granting summary judgment as to Count I, Conversion?
8. Did the Circuit Court err in dismissing Count II, Breach of Duty of Care, Loyalty and Disclosure?
9. Did the Circuit Court err in also granting summary judgment as to Count II?
10. Did the Circuit Court err in dismissing Count III, Fraud/Deceit?
11. Did the Circuit Court err in also granting summary judgment as to Count III?
12. Did the Circuit Court err in dismissing Count IV, Intentional Infliction of Emotional Distress?
13. Did the Circuit Court err in also granting summary judgment as to Count IV?

2. From 2000 to 2002, Lasater was writing a book. The children were cared for by a babysitter and Lasater wrote from a studio apartment she rented.

3. Because we are reviewing the grant of Guttmann's motion for summary judgment, we will present the facts in a light most favorable to Lasater, the non-moving party. *Brooks v. Hous. Auth.*, 411 Md. 603, 615 n. 6, 984 A.2d 836 (2009).

4. Lasater alleges that Guttmann did not always deposit his full salary into their joint account.

to the parties jointly at their home address. For 23 years, Lasater never read any of the bank statements.

Lasater also held a separate bank account ("Inheritance Account") titled only in her name and containing monies she had inherited from several relatives. In 2002, the couple opened a second joint bank account in which Lasater deposited earnings from her inheritance account and other properties titled only in her name. That account, which both parties called the "Education Account," was used to pay private school tuition and other related expenses for the couple's older child.

According to Lasater, without her knowledge, Guttmann spent large sums of money from their joint accounts on various real estate investments, a huge collection of compact discs ("CDs"), and other expenses she cannot identify because she still does not know what they are.[5] The sums Guttmann was spending exceeded the couple's monthly income. To deal with the situation, Guttmann took out several loans against his 401(k) account, some with and some without Lasater's consent,[6] took out a home equity line of credit, ran up an overdraft balance of more than $10,000 on the Joint Checking Account, and accrued credit card debt. Meanwhile, Lasater was "scrimping" to make ends meet, believing, as Guttmann was telling her, that the couple's dire financial situation was a function of her having stopped working. Lasater asserts that she did not know how much money Guttmann was earning during this time and that he withheld that information from her. (In fact, his annual income reached more than $350,000.) She also claims he lied to her, saying he had "gone 'of-counsel' " at his law firm, and therefore no longer was entitled to receive year-end distributions, when that was not the case.

Lasater asserts that her concern about the couple's financial situation heightened in the fall of 2002, after she tried, unsuccessfully, to make a $40 ATM withdrawal from the Joint

---

5. As Lasater acknowledges, the CDs were kept in the couple's home, in the open.

6. These loans are not the subject of the instant appeal.

Checking Account. In December 2002, she told Guttmann she had decided to take over "stewardship" of the family's finances. The next month (January 2003), she began keeping a ledger to track their income and expenses. She and Guttmann wrote their daily expenditures in a journal.[7] For the first time since their marriage, Lasater opened the bank statements and credit card statements that came to their house. It was then she first learned of the existence of the home equity line of credit and the overdraft balance on the Joint Checking Account.[8] According to Lasater, when she questioned Guttmann, he blamed her lack of income for the debts. Thereafter, Lasater and Guttmann refinanced their home mortgage to eliminate the home equity debt and pay off their credit card balances. They also sold certain stocks that were losing money.[9]

On April 22, 2005, Guttmann moved out of the marital home.[10] On or about May 16, 2005, he called to inform Lasater that he would be returning the following Saturday to pick up his computer and other items he had left behind. Lasater then spent three days going through the items in her husband's home office. She found in the closet,[11] beneath gym

---

**7.** Lasater claims, however, that Guttmann did not accurately record his expenditures in the journal. She asserts that she learned this four years later, in 2007, when she compared his ATM withdrawals from their bank statements to his listed expenditures in the journal.

**8.** In the summer of 2003, Lasater applied for a Border's credit card and was rejected. When she contacted the bank to determine why her credit card application had been rejected, she learned of the home equity line of credit and the overdraft balance on the Joint Checking Account.

**9.** Aside from these stocks and the couple's 401(k) accounts and real estate holdings, they had no other savings or investments.

**10.** Lasater alleges that the impetus for Guttmann's leaving was her refusal to use her non-marital inheritance funds to purchase a beach house in North Carolina.

**11.** Lasater alleges she had never seen the closet door open in all the years Guttmann had used the room as an office. The door was behind several pieces of furniture.

bags, sports equipment, and running gear, a red tote bag containing all of the statements for the Joint Checking Account from the past 20 years, in reverse chronological order. She removed these records from the house and placed them in a rented storage unit. Guttmann collected the rest of his belongings from the marital home shortly thereafter and told Lasater he did not plan on returning.

On August 30, 2005, Lasater filed the instant tort action against Guttmann. As mentioned above, Guttmann thereafter filed the divorce case and this case was stayed pending its outcome.

The parties completed extensive discovery in the divorce case. Lasater was awarded sole legal and physical custody of the couple's children. The case was scheduled for trial on all other issues. On the day of trial, the case was called and opening statements were made. Before any evidence was taken, a settlement was reached. The parties agreed that Lasater would receive 75% of the proceeds of the sales of the marital home and the parties' vacation home on the Patuxent River. She also would receive approximately $700,000 of the $1.2 million total balance in the parties' retirement accounts, and an additional $50,000 lump sum payment from Guttmann. Guttmann agreed to forego any claim to the Inheritance Account and to real estate titled in Lasater's name in Reston, Virginia, the District of Columbia, and in St. John in the Virgin Islands. Guttmann agreed to pay Lasater $12,000 a month in indefinite alimony and $5,000 a month in child support. Finally, he agreed to maintain the children on his health insurance plan, to pay their private school tuitions, and to finance their college educations or other vocational expenses.

After the stay in the case at bar was lifted, Guttmann filed a motion to dismiss or, in the alternative, for summary judgment. He argued that Lasater had failed to state any claim for which relief could be granted; and that, as to the conversion, fraud, and breach of fiduciary duty claims, the causes of action were time-barred. Lasater filed a cross-motion for

partial summary judgment and opposed Guttmann's motion.[12] A hearing was held, after which the court held the matter *sub curia.*

On December 19, 2008, the court entered an order granting Guttmann's motion in its entirety and denying Lasater's cross-motion. The order did not specify the basis for the court's ruling, except to say that the dismissal was "for the reasons set forth in [Guttmann's] Motion to Dismiss the Amended Complaint, or in the Alternative, for Summary Judgment[.]"

Lasater noted this timely appeal. We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### *Stay*

When Lasater filed this action, on August 30, 2005, she was representing herself. She did not make any attempt at service upon Guttmann. On October 26, 2005, by then represented by counsel, Lasater filed an amended complaint. On November 14, 2005, Guttmann filed his complaint in the divorce case. One week later, on November 21, 2005, he was served with Lasater's amended complaint in this action.

On December 7, 2005, Guttmann filed a motion to stay this action or, in the alternative, to consolidate it with the divorce case. Lasater opposed the motion. The motion to consolidate was summarily denied in an order dated January 25, 2006. A hearing was scheduled on the motion to stay.

At the hearing on February 27, 2006, Guttmann argued that a stay was required under *Vaughn v. Vaughn,* 146 Md.App. 264, 806 A.2d 787 (2002). In that case, we held that the circuit court had abused its discretion when it declined to stay a tort

---

12. In her cross-motion, Lasater sought partial summary judgment as to four "fundamental" issues: 1) that the parties had a confidential relationship in which Guttmann was the dominant party; 2) that the parties had a fiduciary relationship wherein Guttmann was Lasater's fiduciary; 3) that Guttmann had an affirmative duty to disclose material financial facts; and 4) that Guttmann violated his duty to disclose.

suit filed by a husband against his wife pending the resolution of a later-initiated divorce case. We reasoned that the issues in the tort suit and the divorce case were interrelated and therefore the resolution of the divorce case potentially could resolve the tort issues as well.

Lasater countered that *Vaughn* was "eviscerated" by *Bozman v. Bozman,* 376 Md. 461, 830 A.2d 450 (2003), in which the Court of Appeals abolished the doctrine of interspousal immunity in Maryland. The *Vaughn* holding had relied upon that doctrine as a policy justification for staying the tort suit. In addition, Lasater argued that, unlike the husband's tort claims in *Vaughn,* her tort claims involved financial misconduct by her spouse that occurred years before the marriage became irretrievably broken and, therefore, could not be rectified under the doctrine of dissipation. *See Heger v. Heger,* 184 Md.App. 83, 94–96, 964 A.2d 258 (2009) (explaining that, under the doctrine of dissipation, marital property will be considered extant when it was used by one spouse during the marriage, when the marriage was undergoing an unreconcilable breakdown, to prevent the property's inclusion in the marital estate for equitable distribution). She maintained that the tort damages she was seeking against Guttmann far exceeded any equitable distribution she could obtain through divorce and that she was entitled to a jury trial on her tort claims.

At the conclusion of the hearing, the circuit court ruled as follows:

[C]ertainly, Ms. Lasater has a right to have her tort claims heard.

But I do feel, having reviewed the case law that was cited, and also the pleadings, that a lot of the issues may be heard by the family court. Certainly, the disputes over the marital and separate property. And, certainly, as plaintiff's counsel just outlined in his argument, that the court, the family court is able to consider equitable adjustments as well, you know.

And I do agree that I think that the issues in both cases will be intertwined, and are intertwined. And I do feel that,

and certainly it is within the Court's discretion, I do think that staying the tort action, pending the decision in the family case, is appropriate. It doesn't preclude Ms. Lasater from raising those issues at a later date. But I think that perhaps even the issues that are in the tort case can even be narrowed by whatever the divorce case and divorce court does.

So at this point, I am going to grant the motion to stay.

The court entered an order to that effect that same day.

Lasater moved to lift the stay once during the pendency of the divorce case, on December 6, 2006. Her motion was denied. After the divorce was finalized, she again moved to lift the stay. By then, she was once again representing herself. Her motion was granted and the case at bar was placed back on the active civil docket. As discussed, *supra,* shortly thereafter, the court granted Guttmann's dispositive motion on all counts.

In this appeal, Lasater contends the circuit court ruled improperly, under *Bozman,* by imposing the stay in this case. She concedes that, the stay having already been lifted, the issue is moot. She urges us to consider it anyway, however, arguing that the controversy is capable of repetition and evading review. She asserts that, if we do not address this issue, "tortfeasing spouses will file for divorce" to prevent tort suits from going forward against them, "effectively gutting *Bozman.*"

We decline Lasater's invitation to address this issue. Even if we were to consider it, however, we would find no abuse of the trial court's discretion in staying the instant case during the pendency of the divorce case. As we explained in *Vaughn,*[13] "in a proper case a court may stay proceedings before it pending the determination of another proceeding that may affect the issues raised." 146 Md.App. at 279, 806 A.2d

---

**13.** In *Vaughn,* the parties had been married for less than four years when they separated. Prior to the initiation of a divorce suit, the husband sued the wife for conversion, breach of contract, abuse of

787 (citing *Coppage v. Orlove*, 262 Md. 665, 666–67, 278 A.2d 587 (1971)).  Unlike in *Vaughn*, however, where we considered whether a stay of the tort suit was *required* under the circumstances, the issue here is whether a stay was permissible in the exercise of the circuit court's discretion.  We have no trouble concluding that it was.  There was certain to be overlap between the issues in the divorce case and the case at bar, as will be discussed further, *infra*.  Under the circumstances, it was well within the court's discretion to stay this action until an equitable distribution of marital property could be achieved in the divorce case.

## II.

### *Conversion*

■ Lasater contends the court erred in granting Guttmann's dispositive motion on her conversion claim.  In that

---

process, fraud in the inducement, and injunctive relief. . His claims related to certain personal property he alleged he had left in the marital home when he moved out.

Less than two months after initiating the tort suit, the husband filed a complaint for limited divorce.  Shortly thereafter, the wife filed a countercomplaint in the tort suit, alleging conversion.  She later filed a counterclaim in the divorce action and moved to stay the tort suit pending resolution of the divorce action.  Her motion was denied.  She later renewed her motion to stay at the outset of the trial in the tort suit, arguing that, with respect to her husband's conversion claim and her countercomplaint, the court would have to determine if certain property was marital or non-marital property and that that issue properly should be resolved by the court in the divorce case.  The court left it up to the husband whether he wished to proceed and he, against the advice of his own counsel, chose to proceed.  At the conclusion of the trial, the court made numerous rulings in favor of the husband, including a ruling on the wife's countercomplaint that certain United States Treasury Bonds, which were titled in the wife's name, were the husband's sole property.

On appeal, this Court ruled that the circuit court had abused its discretion by failing to exercise that discretion to stay the tort suit pending resolution of the divorce action.  In so deciding, we emphasized that the circuit court possessed the fundamental authority to decide the issues raised in the tort suit, but that it should have declined to do so because the issues were so intertwined with issues in the divorce case.  We also discussed the applicability of the doctrine of interspousal immunity as it related to the conversion claims.

claim, she alleged that Guttmann converted monies from the Joint Checking Account to his personal use without her consent, and that the monies in question were "separate and identifiable," and therefore could be converted. Guttmann counters that the monies Lasater alleges were wrongfully converted were commingled with the couple's joint funds and, accordingly, no longer could be identified, as a matter of law, and therefore could not be converted.

Before addressing this contention, we first shall address the scope of our review. As noted, Guttmann moved to dismiss or, in the alternative, for summary judgment as to the conversion count and the other three counts in Lasater's amended complaint. He attached to his motion excerpts of Lasater's deposition testimony from the divorce case; a Christmas newsletter Lasater mailed out in 2000; a transcript of the hearing in the divorce case during which the parties placed their settlement agreement on the record; and the parties' joint statement concerning marital and non-marital property in the divorce case. Lasater opposed the motion, attaching 24 exhibits and a 106–page affidavit.[14] After holding a hearing, the circuit court issued an order granting Guttmann's motion in its entirety "for the reasons set forth" therein and directing that Lasater's amended complaint be "DISMISSED, WITH PREJUDICE."

As noted above, the court's order does not reflect the ground (or grounds) upon which each count was dismissed, nor does it reveal whether the judge considered the evidentiary materials attached to the motion or to Lasater's opposition. "Pursuant to Maryland Rule 2–322(c), when a trial judge is

---

14. Lasater originally filed a 61–page opposition and cross-motion, along with a motion to grant her an exception to the page limitation and the font size imposed by the circuit court's scheduling order. Under the scheduling order, all motions were to be limited to 15 pages and oppositions and replies to 10 pages. Lasater's motion was granted in part and denied in part, directing her to limit her opposition to 15 pages (measured using the standard 12–point font), but permitting her to print her opposition in a larger font due to problems she asserts she has with her eyesight. She subsequently filed a "shortened" opposition and cross-motion.

presented with factual allegations beyond those contained in the complaint to support or oppose a motion to dismiss and the trial judge does not exclude such matters, then the motion shall be treated as one for summary judgment." *Okwa v. Harper,* 360 Md. 161, 177, 757 A.2d 118 (2000). Thus, we must treat the court's order as the grant of summary judgment. As we have explained, in reviewing a grant of summary judgment:

> We review a circuit court's decision to grant summary judgment *de novo. Crickenberger v. Hyundai Motor America,* 404 Md. 37, 45, 944 A.2d 1136 (2008). Our review is two-fold. First, we determine whether there was or was not a genuine dispute of material fact on the summary judgment record. *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 294, 936 A.2d 343 (2007). A material fact is a fact that, if found one way or the other, will affect the outcome of the case. *Miller v. Bay City Property Owners Ass'n,* 393 Md. 620, 631, 903 A.2d 938 (2006). Second, if there is no genuine dispute of material fact, we determine whether the party that obtained summary judgment was entitled to judgment in its favor, as a matter of law. *Crickenberger, supra,* 404 Md. at 45, 944 A.2d 1136.

*Zitterbart v. Am. Suzuki Motor Corp.,* 182 Md.App. 495, 501–02, 958 A.2d 372, cert. denied, 406 Md. 581, 961 A.2d 555 (2008).

▬ "Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym,* 379 Md. 249, 261, 841 A.2d 828 (2004). It is defined as " 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.' " *The Redemptorists v. Coulthard Servs., Inc.,* 145 Md.App. 116, 155, 801 A.2d 1104 (2002) (quoting *Interstate Ins. Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954)). The "act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer

than the rightful possessor permits." *Darcars Motors, supra,* 379 Md. at 261–62, 841 A.2d 828.

> Lasater alleged in her amended complaint that Guttmann exercised unlawful dominion and control over money that rightfully belonged to [her] by spending it on personal adventures, exotic merchandise and ill-advised real estate projects in a manner that was totally inconsistent with his authority and his duty to [her] and his family.

According to Lasater, Guttmann "misappropriate[d]" monies from the Joint Checking Account and her separate money for his own private use. On several occasions, she deposited monies from her Inheritance Account into the Joint Checking Account "specifically and expressly to use for the family's 'day-to-day family living expenses.' "

■ "The general rule is that monies are intangible and, therefore, not subject to a claim for conversion." *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 564, 731 A.2d 957 (1999). An exception to this rule exists, however, if the monies alleged to have been converted are "specific segregated or identifiable funds." *Id.* According to Lasater, her deposits of monies from the Inheritance Account were "specific, segregated, identifiable separate funds" that Guttmann wrongfully converted. While not entirely clear, it appears that she is asserting that, at Guttmann's request, she made specific transfers of monies from the Inheritance Account to the Joint Checking Account for household expenses. She does not maintain that these specific funds then were spent by Guttmann on non-household expenses or that they otherwise were wrongfully converted. Rather, she asserts that Guttmann on numerous occasions spent funds from the Joint Checking Account without her consent for non-marital purposes and, on at least one occasion, made a large transfer to another account.

As Guttmann counters, however, once these monies were commingled with the couple's joint funds, they lost their separateness for purposes of a conversion claim. *See Jasen, supra,* 354 Md. at 565 n. 4, 731 A.2d 957 (noting that a claim for conversion of wages by way of a wrongful garnishment

only could stand if the garnished monies had not be commingled with other funds). For this reason alone, Lasater's conversion claim fails and there was no error in the grant of summary judgment as to this count.

## III.

### *Intentional Infliction of Emotional Distress*

The elements of the tort of intentional infliction of emotional distress ("IIED"), first recognized in Maryland in *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977), are: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." (Citing *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (Va.1974).) "Extreme and outrageous" conduct is such that is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 567, 380 A.2d 611 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt.d (1965)). "Whether the conduct complained of meets this test is, in the first instance, for the court to determine[.]" *Batson v. Shiflett*, 325 Md. 684, 734, 602 A.2d 1191 (1992).

In support of his motion, Guttmann argued below that, accepting as true all of the allegations in the amended complaint and the facts averred in Lasater's affidavit, his conduct did not rise to the level of "extreme and outrageous." For the reasons that follow, we agree.

Lasater makes the following relevant allegations in her amended complaint and in her affidavit: Guttmann actively deceived her for many years with regard to his income, his expenditures, and his extramarital activities; Guttmann, on one occasion, lost his temper, yelled that he did not like her "tone of voice," and she did not "trust him"; Guttmann took advantage of his knowledge of abuse Lasater suffered as a child and her experience growing up with very little money;

Guttmann "deliberately, consciously, and maliciously made [Lasater] feel solely responsible for the family's financial plight"; and Guttmann "never expressed any remorse" or "'came clean'" about his role. As a result of this conduct, Lasater "experienced a slow, steady and debilitating decline in her physical health due to gratuitous and unnecessary stress," including gastrointestinal problems, pneumonia, vestibular neuronitus,[15] and premature menopause.

In addition, Guttmann subjected Lasater to public humiliation. The example she gives is that the chaplain at her daughter's private school asked the congregation to "pray 'for John and Nancy'" as a result of their financial troubles.

In her affidavit, Lasater describes several other instances when Guttmann blamed her for their financial problems, troubles, yelled at her, humiliated her, or otherwise caused her stress. She described a "particularly heinous" incident that happened in January of 2003, after she discovered Guttmann's credit card debt and questioned him about it. She was sobbing and asking him why he had not told her about the debt. He responded, "I didn't want you to know what you were doing to our family."

In another instance, she avers that in 1996 she questioned Guttmann about why she needed to work outside the home and he became enraged, leapt from the couch where they were sitting, and yelled that "he was working 'to buy the butt wipes!'" for their daughter. Another time, in 2004, Guttmann yelled at her "so loudly and so aggressively" that she curled up into a fetal position.

In the 30 years since the Court of Appeals recognized the tort of IIED, it has upheld such claims only four times. *See Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993) (reversing dismissal when HIV-positive surgeon operated on the appellants without their knowledge of his disease); *Figueiredo–*

---

**15.** "Vestibular neuronitus" is a "disturbance of vestibular function consisting of a single attack of vertigo, usually accompanied by nausea and vomiting but without auditory symptoms[.]" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1287 (31st ed.2007).

*Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991) (reversing dismissal when plaintiff alleged psychologist engaged in sexual relations with plaintiff's wife during the time he was counseling the couple); *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (cause of action for IIED could exist when physician had sex with nurse without informing her he had herpes and infected her with the disease); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 492 A.2d 1270 (1985) (reversing dismissal when workers' compensation insurer insisted that claimant submit to psychiatric evaluation for the "sole purpose" of harassing her and forcing her to drop her claim or commit suicide). The Court of Appeals has emphasized that "the tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Kentucky Fried Chicken Nat'l Mgmt. v. Weathersby,* 326 Md. 663, 670, 607 A.2d 8 (1992) (citing *Batson, supra,* 325 Md. at 734–35, 602 A.2d 1191).

The behavior alleged in the instant action simply does not rise to the level of extreme or outrageous conduct. Assuming as true Lasater's allegations, Guttmann caused his wife to believe she was to blame for their financial difficulties, yelled at her on several occasions, and deceived her about their finances and his personal life. This behavior is not "so extreme in degree [ ] as to go beyond all possible bounds of decency[.]" *Harris, supra,* 281 Md. at 567, 380 A.2d 611. It pales in comparison to the behavior alleged in the few cases held to have met the high threshold for extreme or outrageous conduct. Accordingly, the circuit court did not err in granting summary judgment in favor of Guttmann.

## IV.

### *Breach of Fiduciary Duty and Fraud*

In her amended complaint, Lasater alleged that Guttmann "took advantage of [a] relationship of trust and confidence" to secretly finance real estate investments, CD purchases, and other as yet undetermined expenditures, and that he "intentionally defrauded and deceived [her] in order to misappropri-

ate for his own private purposes hundreds of thousands of dollars of joint funds and [her] money." Lasater asserted that Guttmann owed her duties of care, loyalty, and disclosure by virtue of their relationship as husband and wife and what she alleges was his dominant position in their marriage, and that he breached these duties by spending their joint monies and her separate monies on "personal adventures and exotic merchandise"; by failing to inform her about the couple's true financial situation; and by actively concealing their debts. With respect to the fraud count, Lasater alleged that Guttmann made numerous misrepresentations to her and "remained silent when there was a duty to speak, about material matters relating to the couple's and Lasater's finances."

Guttmann argued below that Lasater's fraud and breach of fiduciary duty claims were barred by limitations; and that Lasater failed to state a claim for which relief could be granted as to both counts because he had no legally cognizable duty to her to disclose spending from their Joint Checking Account and he was incapable of concealing such conduct from her when she had equal access to the couple's bank statements.

Lasater responded that the statute of limitations was tolled by Guttmann's fraud and, accordingly, her claim did not accrue until August of 2005, when she discovered the red tote bag containing their Joint Checking Account statements. She further argued that she had complied with the dictates of *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), in framing her cause of action for breach of fiduciary duty and that, by virtue of their "confidential relationship," Guttmann owed her an affirmative duty to disclose and not to misrepresent his financial dealings and the couple's financial status.

Lasater repeats her arguments below in this Court, as does Guttmann. Because we find merit in the assertion that, on the facts viewed most favorably to Lasater, Lasater has not stated a viable claim for breach of fiduciary duty or fraud, we shall affirm the grant of summary judgment on those counts on that basis.

(a)

### Breach of Fiduciary Duty

The seminal Maryland case about breach of fiduciary duty as a cause of action at law is *Kann v. Kann, supra,* 344 Md. 689, 690 A.2d 509. In that case, the beneficiary of a trust brought a counterclaim against the trustee in a declaratory judgment action brought by the trustee. The trustee was seeking a declaration of the rights and obligations of the parties to certain segregated assets previously part of the trust. The beneficiary made a claim for breach of fiduciary duty in her counterclaim, and prayed a jury trial. Her counterclaim was dismissed for failure to state a claim for which relief could be granted, and the declaratory judgment action was tried to the court. The trustee prevailed. The beneficiary appealed, arguing, in part, that the circuit court had erred in dismissing her counterclaim and not trying her claim to a jury.

The Court of Appeals first considered whether the beneficiary had been entitled to a jury trial on any of her claims. It concluded that she had not because a suit by a beneficiary against a trustee for breach of fiduciary duty historically has been within the equity jurisdiction of the circuit court. The Court next turned to the question whether a breach of fiduciary duty "constitutes a tort in the sense that it would be actionable at law, triable to a jury, and, in appropriate cases, capable of supporting punitive damages." *Id.* at 706, 690 A.2d 509. The Court noted that it twice had assumed, without deciding, the existence of such a separate cause of action in tort, *see Adams v. Coates,* 331 Md. 1, 12, 626 A.2d 36 (1993), and *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.,* 340 Md. 176, 191–92, 665 A.2d 1038 (1995), but never actually had recognized the tort.

The Court looked to Section 874 of the RESTATEMENT (SECOND) OF TORTS (1977), entitled "Violation of Fiduciary Duty," which states: "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." It concluded, based

upon the comments to Section 874, that the section was not meant to create an action at law for any breach of fiduciary duty. Rather, the traditional "law/equity dichotomy" applied equally to such breaches and, therefore, the starting point for determining the existence of such a cause of action remained an historical analysis of the remedy (or remedies) available for the particular breach alleged.

In its analysis, the Court rejected this Court's analysis in *Hartlove v. Maryland School for the Blind,* 111 Md.App. 310, 681 A.2d 584 (1996), *overruled by Kann, supra,* 344 Md. at 709, 690 A.2d 509, in which a divided panel held that "fiduciaries who breach their duty should be held accountable under an independent cause of action aimed" at their wrongful conduct. 111 Md.App. at 331, 681 A.2d 584. The *Kann* Court concluded that, in purporting to recognize a general cause of action in tort for breach of fiduciary duty, this Court had "read too much into § 874 of the Restatement." 344 Md. at 710, 690 A.2d 509. That section, according to the Court, recognizes "the universal proposition that a breach of fiduciary duty is a civil wrong, but the remedy is not the same for any breach by every type of fiduciary." *Id.* Relying upon its earlier conclusion that the beneficiary's claims against the trust were equitable in nature, the Court rejected the beneficiary's attempt to enlarge the damages liability of the trustee by transforming her equitable suit into a tort action in which compensatory damages and possibly punitive damages could be recovered.

The *Kann* Court held as follows:

[The beneficiary] asks this Court to make a very far reaching change in Maryland law by creating a tort that will apply to *all fiduciaries.* Neither [the appellant] nor the Court of Special Appeals in *Hartlove* has undertaken to review all of the relationships to which the new tort would apply. There has been no analysis of whether, as to any given fiduciary relationship, the tort would duplicate existing remedies at law or would eliminate, as in the case of trustees, the nearly complete exclusivity of equitable jurisdiction. There has been no analysis of the effect of the new

tort on the probate area. Further recognition of the new tort would make trustees, and any other fiduciaries whose breaches are currently primarily remediable in equity, subject to potential liability for punitive damages.

\* \* \*

**Accordingly, we hold that there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.** Whether the cause or causes of action selected carry the right to a jury trial will have to be determined by an historical analysis. Counsel do not have available for use in any and all cases a unisex action, triable to a jury. This Court would not preside over the death of contract by recognizing as a tort a breach of contract that was found to be in bad faith. Nor shall we preside over the death of equity by adopting [the appellant]'s contentions.

*Id.* at 713, 690 A.2d 509 (internal citations omitted) (italics in original; bold added).

The breach of fiduciary duty tort claim Lasater is pursuing is for the violation by one spouse of an alleged fiduciary responsibility to the other spouse to properly use and maintain marital funds for the benefit of the marital unit. (Although Lasater and Guttmann no longer are married, Lasater's breach of fiduciary duty claim is based upon their prior status as spouses and upon events alleged to have happened during the marriage.) Under *Kann,* therefore, the threshold question is whether any fiduciary duty could exist under the facts asserted, when the claimed fiduciary relationship was husband and wife.

Before we embark upon our analysis of that issue, we must disabuse Lasater of the notion, central to the arguments she makes, that the abrogation of the doctrine of interspousal immunity in Maryland compels the conclusion that breaches of marital duties now may be vindicated in this State by causes of action in tort for breach of fiduciary duty between spouses. The doctrine of interspousal immunity acted as a bar to a civil action by one spouse against the other. It operated to prevent one spouse from taking legal action against the other spouse for a civil wrong that, had it been committed by a non-spouse, would have been actionable. For example, a driver on a Maryland road owes a duty to others generally to operate his or her vehicle with care. In the days of interspousal immunity, a spouse who drove negligently, causing injury to the other spouse, could not be sued for damages, even though the negligent spouse would have been liable in tort to the injured spouse if they were not married.

The removal of the bar of interspousal immunity in Maryland means that the same injured spouse now can sue the negligent spouse in tort, just as the injured spouse could have sued any other negligent driver. It does *not* mean, however, that the marital relationship itself now gives rise to duties that are actionable in tort. *See Doe v. Doe*, 358 Md. 113, 121, 747 A.2d 617 (2000) (stating that "[a] claim of immunity is a defense. It need be reached only if the plaintiff has alleged a viable cause of action."). Accordingly, the question whether Maryland recognizes marital torts is independent of the issue of interspousal immunity To be sure, because interspousal immunity existed throughout Maryland's legal history, until the last vestiges of the doctrine were removed in 2003, the marital tort issue never could arise, as spouses could not sue each other at all. It does not follow from the abrogation of the doctrine, however, that marital torts are now cognizable in Maryland.

We return to our analysis. A fiduciary relationship sometimes is described in contrast to a confidential relationship, with which it often is confused but from which it differs. In *Buxton v. Buxton*, 363 Md. 634, 654, 770 A.2d 152 (2001), the

Court of Appeals explained the difference between "the duties and obligations of true fiduciaries" and the duties and obligations "that may exist between any two or more people" who by their conduct enter into a confidential relationship:

> Professor Scott articulates the distinction quite well. A fiduciary relationship, he observes, such as between trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, corporate directors and their corporation, "involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." 1 Scott and Fratcher, The Law of Trusts [ ] § 2.5 [ (4th ed.1988) ]. That is not necessarily the case with respect to persons in a confidential relationship. Scott and Fratcher note:
>
>> "A fiduciary relation is to be distinguished from a merely confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship.... A fiduciary relation involves certain consequences as to transactions between the parties that flow automatically as a matter of law from the relation.... On the other hand, where there is merely a confidential relation between the parties, such consequences do not automatically follow."

*Buxton, supra* at 654–55, 770 A.2d 152 (quoting 1 Scott & Fratcher, The Law of Trusts, *supra*, § 2.5).

As the above makes evident, in Maryland, a husband and wife are not true fiduciaries, as a matter of law, absent an agreement establishing that relationship.[16] More-

---

16. In at least nine states, spouses are considered to occupy a fiduciary relationship: Arizona (*Mezey v. Fioramonti,* 204 Ariz. 599, 608, 65 P.3d 980 (Ariz.Ct.App.2003), *overruled on other grounds by Bilke v. State,* 206 Ariz. 462, 80 P.3d 269 (Ariz.2003)); California (Cal. Fam.Code

over, Maryland law also makes plain that a husband and wife are presumed not to occupy a confidential relationship. *Upman v. Clarke,* 359 Md. 32, 42, 753 A.2d 4 (2000); *Bell v. Bell,* 38 Md.App. 10, 13–14, 379 A.2d 419 (1977).[17] The Court in *Upman* explained that, while there are some relationships that are presumed confidential, "[o]therwise, and particularly in family relationships, such as parent-child and husband-wife, the existence of a confidential relationship is an issue of fact and is not presumed as a matter of law." 359 Md. at 42, 753 A.2d 4.[18]

---

§§ 1100(e), 1101 (West 2004)); Idaho (*Compton v. Compton,* 101 Idaho 328, 612 P.2d 1175, 1182–83 (1980)); Louisiana (La. Civ.Code Ann. arts. 2354, 2369 (2009)); Nevada (*Williams v. Waldman,* 108 Nev.466, 836 P.2d 614, 618 (1992)); New Mexico (*Roselli v. Rio Cmtys. Serv. Station, Inc.,* 109 N.M. 509, 513–14, 787 P.2d 428 (N.M.1990)); Oregon (*Dunkin v. Dunkin,* 162 Or.App. 500, 507–08, 986 P.2d 706 (Or.Ct.App. 1999)); Texas (*Knight v. Knight,* 301 S.W.3d 723, 731 (Tex.App.2009)); and Washington (*In re Marriage of Matson,* 107 Wash.2d 479, 484, 730 P.2d 668 (Wash.1986)). The majority of these states are community property, as opposed to equitable distribution, states. *See Wilkinson v. Wilkinson,* 905 So.2d 1, 8–10 n. 2 (Ala.Civ.App.2004) (cataloguing the equitable distribution and community property states).

**17.** Before ratification of the Maryland Equal Rights Amendment in 1972, Maryland law presumed that in any marriage "a husband was the dominant party in marital situations," *Tedesco v. Tedesco,* 111 Md.App. 648, 666, 683 A.2d 1133 (1996), and wielded final decision-making authority in financial (and other) matters. *See, e.g., Manos v. Papachrist,* 199 Md. 257, 262, 86 A.2d 474 (1952) (discussing the "natural dominance of the husband over the wife"); *Cannon v. Cannon,* 156 Md.App. 387, 412–13, 846 A.2d 1127 (2004), *aff'd by* 384 Md. 537, 865 A.2d 563 (2005). Thus, cases decided during that time describe the spousal relationship as "confidential." *See e.g. Richardson v. Richardson,* 17 Md.App. 665, 683–84, 304 A.2d 1 (1973) (observing that husband and wife occupy a confidential relationship and duty of mutual candor between them). After passage of the Maryland ERA, the presumption of dominance no longer could stand. *Bell, supra,* 38 Md.App. at 13–14, 379 A.2d 419. *See also Eckstein v. Eckstein,* 38 Md.App. 506, 511, 379 A.2d 757 (1978). Now, it is well established that one spouse does not have authority over the other spouse. *Neale v. Wright,* 322 Md. 8, 18–19, 585 A.2d 196 (1991).

**18.** By contrast, in some states, the spousal relationship is presumed to be a confidential one. *See, e.g.,* Florida (*Beers v. Beers,* 724 So.2d 109, 117 (Fla.Dist.Ct.App.1998)); North Carolina (*Smith v. Smith,* 113 N.C.App. 410, 438 S.E.2d 457, 459 (1994)); South Dakota (*Jeffries v. Jeffries,* 434 N.W.2d 585, 587–88 (S.D.1989)); Virginia (*Grow v. Grow,*

The proponent of a confidential relationship bears the burden of showing that it exists, *i.e.*, that by virtue of the relationship she (or he) was justified in assuming that the other spouse would not act in a manner inconsistent with her (or his) welfare. *Hale v. Hale*, 74 Md.App. 555, 566, 539 A.2d 247 (1988); *Tedesco, supra*, 111 Md.App. at 673, 683 A.2d 1133; *Bell, supra*, 38 Md.App. at 13, 379 A.2d 419. *See also Green v. Michael*, 183 Md. 76, 84, 36 A.2d 923 (1944) (holding that, " '[t]o establish [a confidential relationship,] there must appear at least a condition from which dependence of the grantor [of a trust] may be found' ") (quoting *Snyder v. Hammer*, 180 Md. 690, 23 A.2d 653 (decision reported without opinion), 180 Md. 690, 23 A.2d 653, 655 (opinion reported in full) (1942)). Among the factors to be considered in deciding whether a confidential relationship exists are " 'the age, mental condition, education, business experience, state of health, and degree of dependence of the spouse in question.' " *Tedesco, supra*, 111 Md.App. at 671, 683 A.2d 1133 (quoting *Bell, supra*, 38 Md.App. at 13–14, 379 A.2d 419).

The Maryland law of confidential relationships has developed in cases involving family relations in which the validity *vel non* of particular transactions or agreements between the parties has been in question. *See, e.g., Upman, supra*, 359 Md. at 42, 753 A.2d 4 (confidential relationship between elderly and questionably competent donor of trust and donee nephew who cared for her needs was not in dispute); *Hale, supra*, 74 Md.App. at 555, 539 A.2d 247 (confidential relationship between husband and wife when wife less educated and physically and emotionally unwell). In such cases, the effect of the trier of fact finding a confidential relationship between the parties is to shift the burden of proof away from the person seeking to set the transaction or agreement aside and to place the burden on its proponent to show that it should remain in place. In *Bell*, for example, this Court explained that, in the absence of proof of a confidential relationship, a

2000 WL 84438, at *1–2, 2000 Va.App. LEXIS 32, at *4 (Va.Ct.App. 2000)).

separation agreement between spouses that is not facially unjust or inequitable is presumed valid, and the spouse challenging the agreement bears the burden of proving that it resulted from fraud, coercion, or mistake. 38 Md.App. at 14, 379 A.2d 419. When a confidential relationship is shown to exist between the parties, however, the burden shifts to the spouse advocating the agreement to prove that it was *not* the product of fraud, coercion, or mistake.[19]

Because Maryland does not consider the relationship between spouses to be one that is by nature fiduciary, and there is no allegation that by agreement Guttmann was acting as a true fiduciary, Lasater's breach of fiduciary duty claim must be based, if at all, on an assertion that, as a matter of fact, she occupied a confidential relationship with Guttmann with respect to the couple's finances. (For ease of discussion, we shall continue to call the claim one for breach of fiduciary duty.) It is important to note, however, that this case does not concern a particular transaction or agreement between Lasater and Guttmann that Lasater is seeking to set aside. Her breach of fiduciary duty claim is far more expansive than that. She is alleging that, for virtually all of the parties' marriage, she occupied a position of trust and confidence *vis a vis* her husband regarding his financial management of their marital funds; that for the duration of the marriage, at least until 2003, he mismanaged those funds; and that, as a result, over time the couple's marital estate lost its value, so that it was worth less than it would have been had Guttmann not been mismanaging it. This action is not an attempt by

---

**19.** As noted above, Maryland law does not presume that spouses are in a confidential relationship. That is not the case with people who are engaged to marry, however. Maryland law presumes that an engaged couple occupies a confidential relationship. *See Cannon, supra,* 384 Md. at 570–71, 865 A.2d 563; *Hartz v. Hartz,* 248 Md. 47, 56, 234 A.2d 865 (1967); *Martin v. Farber,* 68 Md.App. 137, 141, 510 A.2d 608 (1986). Therefore, in the case of a prenuptial agreement, the party who is the proponent of the agreement bears the burden to show that there was not "overreaching." *Cannon, supra,* 384 Md. at 573, 865 A.2d 563. Most often, this burden is met through proof of a "full, frank, and truthful disclosure of his or her assets and their worth" prior to the execution of the agreement. *Id.*

Lasater to set aside a particular transaction or agreement, or even specific transactions or agreements, between her and Guttmann. It is an attempt to recover as damages her portion of the loss in value of the marital estate caused by Guttmann's breach of the duty she maintains he owed her to properly manage the marital funds he controlled.

As already mentioned, Lasater maintains that Guttmann depleted the parties' marital estate over the years by spending marital funds on unsuccessful real estate transactions in the Carribean, on an extensive CD collection, and on other items and activities not specified. One particular example she gives, to illustrate that she will be able to prove damages, is the couple's marital home in Bethesda. Lasater asserts that because Guttmann was wasting marital funds on losing endeavors, or at least on endeavors that did not advance the position of the marital estate, he did not spend any of the funds on upkeep of the marital home. As a consequence, it became run down. When the parties put it on the market as part of the divorce settlement, it sold to a developer for $650,000. Within months, the developer renovated the house and sold it for $1,150,000. Lasater is seeking tort damages from Guttmann for breach of fiduciary duty for the difference between 75% of the profit that would have been realized from the sale of the marital home had the home been maintained and 75% of the profit that actually was realized from the sale of the home.

Our survey of cases from other jurisdictions reveals that, even when the relationship of husband and wife is considered confidential *as a matter of law*, courts have not permitted a spouse or former spouse to use a breach of fiduciary duty action to launch a broad attack on the other spouse's (or former spouse's) handling of financial matters during the marriage. For example, in *Smith v. Smith, supra*, 438 S.E.2d at 458, the North Carolina Court of Appeals upheld a trial court's dismissal of a breach of fiduciary duty claim by a former husband against a former wife. The former husband had alleged that, during the marriage, the former wife had engaged in numerous adulterous affairs, and had used marital

funds to finance them. He sought to recover those funds as damages.

The court observed that the North Carolina appellate courts only had found a breach of a spouse's confidential duty to the other spouse "within the context of a distinct agreement or transaction between the spouses." *Id.* at 459. Noting that the former husband was not seeking to set aside a particular transaction or agreement between the former spouses, the court held that he had not stated a cause of action for which relief could be granted. *See also Beers, supra,* 724 So.2d at 117 (affirming the dismissal of a tort action for breach of fiduciary duty and fraud against a former husband and holding "that one spouse may not be sued by the other in tort for a breach of [the] confidential relationship [of husband and wife] which results in a loss of marital property, in the absence of a distinct agreement or transaction between the spouses"(footnote omitted)).[20]

The closest we have come in our research to finding a broad cause of action between spouses for mismanagement of marital property is a statutory claim that exists in Wisconsin for breach of a duty of good faith between spouses. Section 766.15(1) of the Wisconsin Statutes Annotated ("WSA") (West 2009) states: "Each spouse shall act in good faith with respect to the other spouse in matters involving marital property or property of the other spouse." WSA section 766.70 establishes remedies for a violation of the duty to act in good faith, including an accounting, the addition of a spouse's name to an item of marital property, and temporary or permanent limitation or termination of a spouse's management or control rights over certain marital property. These statutory provisions are unique to Wisconsin; they come verbatim from the Uniform Marital Property Act of 1983, sections 2(a) and 15. 9A U.L.A. 114 & 143 (1998). Effective January 1, 1986, Wisconsin

---

**20.** The courts in *Smith* and *Beers* also both declined to draw an analogy between marriage and a business partnership, in which the members owe duties to account for funds and to spend them reasonably. *Smith, supra,* 438 S.E.2d at 459; *Beers, supra,* 724 So.2d at 117 n. 5.

adopted that act. WSA §§ 766.001 to 766.97. It is the only state to have done so.

Interestingly, the Wisconsin cases in which these "good faith" statutes have been interpreted have held that they apply only to spouses who have not petitioned for divorce. "[O]nce a divorce action is filed, a claim made encompassing such a cause of action must be resolved in divorce court." *Knafelc v. Dain Bosworth, Inc.*, 224 Wis.2d 346, 591 N.W.2d 611 (App.1999). Thus, in Wisconsin, a case like the one at bar would not be permitted.

Indeed, courts in other jurisdictions in which the spousal relationship is considered confidential as a matter of law have declined to recognize tort claims between spouses for breach of fiduciary duty, fraud, and the like on the ground that whatever wrong was committed can be remedied in the parties' divorce action. In *Schlueter v. Schlueter*, 975 S.W.2d 584 (Tex.1998), in the parties' suit for divorce, the wife filed a counterclaim against her husband and a claim against her father-in-law for fraud, breach of fiduciary duty and conspiracy on the allegation that, prior to the filing of the divorce action, the husband transferred various "community" assets to his father. (Texas is a community property state.) The tort claims were tried to a jury, which found in favor of the wife. Based upon the jury's finding, the trial court declined to divide the community property equally, but exercised its discretion to distribute a larger share of the assets to the wife. The court also awarded the wife punitive damages.

The Texas Supreme Court reversed the judgment in part, holding that the discretion courts in Texas have to render a "just and right" distribution of community property upon divorce (*i.e.*, not to divide it equally), accords a wronged spouse an adequate remedy for fraud on the community, and therefore "there is no independent tort cause of action between spouses for damages to the community estate." *Id.* at 585. *See also Beers, supra*, 724 So.2d at 117 (holding that husband's transfer of money out of the marital estate prior to divorce could be dealt with in the divorce action under the

dissipation doctrine); *Horwitz v. Horwitz,* 16 S.W.3d 599, 603–04 (Mo.Ct.App.2000) (holding that husband's taking of certain marital funds prior to the divorce was properly handled by the divorce court under the doctrine of dissipation and that the wife's breach of fiduciary duty claim based upon that same conduct was barred by collateral estoppel).

In Massachusetts, as in Maryland, the relationship of husband and wife is not presumed confidential but can be found confidential on the facts. *Yousif v. Yousif,* 61 Mass.App.Ct. 686, 814 N.E.2d 14 (Mass.App.Ct.2004), is an example of a trial court's making a finding, affirmed on appeal, of a confidential relationship between a husband and wife. The parties had married in Lebanon when the wife was an impoverished 18–year–old and the husband was in his 50s and claimed to be a man of means. He told the wife he had been married twice before. He promised her that if they married they would move to the United States and live an affluent life. They married and moved to this country, but instead of living well, the wife was practically held hostage in a small apartment for seven years. The husband lived extravagantly but did not share any of his wealth with the wife. Contrary to what he had told her, this was his fourth marriage.

During the seven years she lived in the small apartment, the wife gave birth to two children. She did not speak English, although she was able to learn some of the language from watching television. She rarely left the apartment because the husband told her that he had arranged for her throat to be slit if she went outside. The only times she went outside was with the husband, and only after she had begged him. Her eyes were not able to adjust properly to light because of the amount of time she spent inside. The husband physically and verbally abused the wife and, if not actually abusing her, was threatening to do so. He kept complete control over her, and did not allow her to have any information about the family finances. The wife was expected to perform all household chores and to raise the children without assistance from the husband.

The husband undertook to have a house built for the family. He considered the house to be his only, and not his wife's, notwithstanding that marital funds were used to purchase the land and build the house. At the husband's direction, the wife was tasked with making all repairs to the property necessitated by contractors who did not finish their work, performing yard work, shoveling, and decorating. After the construction was completed, the husband conveyed the house to a family trust in Lebanon to which the wife had no access. He accomplished the conveyance by forcing the wife to sign papers under threat of physical harm and lying to her, telling her that he was putting the house solely in her name, to make her "human." *Id.* at 695, 814 N.E.2d 14. In fact, the documents she signed had placed the house in the family trust.

The husband then purchased a service station and forced the wife to work there with him, for no pay. When he sold the service station, he transferred most of the money to Lebanon.

The husband only rarely permitted the wife to talk on the telephone to her family members in Lebanon, and when he did, he monitored the calls. The family returned to Lebanon to visit three times. During the last visit, which was 14 years after the parties were married, she was allowed to see her family for one hour only, and her children were not allowed to see them at all. When the family returned to the United States from that visit, the wife filed for divorce.

The trial court found as a matter of fact that there was a confidential relationship between the husband and the wife that obligated the husband to act for the wife's benefit, and that the husband violated that duty by placing the marital home in a trust, " 'effectively eliminating the wife's interest.' " *Id.* As a remedy, the court imposed a constructive trust, for the wife's benefit, on all the proceeds of the sale of the marital home.

In affirming the trial court's findings, the appellate court held that, although a confidential relationship does not exist between spouses merely because they are married, the evidence was sufficient to support the finding that a confidential

relationship existed between the husband and wife because of the husband's complete domination of the wife and her reliance upon his experience in financial affairs; and the evidence further supported the finding that the husband breached the confidential relationship by tricking the wife into transferring her interest in the couple's house into a trust.

To be sure, the facts in *Yousif* were extreme. *Hale v. Hale,* *supra,* 74 Md.App. at 555, 539 A.2d 247, is tame by comparison, but nevertheless provides a good example of the dominant/subservient nature of a confidential relationship between spouses. In *Hale,* the circuit court set aside a separation agreement entered into by spouses on the ground, among others, that the husband and wife were in a confidential relationship and the agreement did not fairly distribute the parties' considerable assets. The couple had been married for 17 years. The wife had attended a community college for one year; had limited business experience, functioning in a merely ministerial role with her husband's company; managed the couple's household only by following a budget given to her by her husband; did not have a bank account before the couple separated; only had signed documents relating to the husband's business because he had directed her to; and was not well physically or emotionally. She had signed a separation agreement that her husband presented to her that was prepared by the husband's lawyer (even though she thought the lawyer was representing her) and upon reassurances by the husband that if she signed the agreement they would reconcile.

This Court affirmed the ruling of the circuit court on the ground that the non-clearly erroneous factual findings established that the husband long had occupied a position of dominion and control over the wife in financial and business matters; that he thus was in a confidential relationship with her; that she was entitled, based on that relationship, to trust that he would take care of her, even in the creation of a separation agreement; and, with the confidential relationship established as a matter of fact, the husband had failed to satisfy his burden of showing that the separation agreement

was fair to his wife. (In fact, the agreement gave her only a tiny fraction of the marital estate.)

■ We return to our analysis of whether Lasater's claim for breach of fiduciary duty is actionable under Maryland law. We conclude that it is not.

As we already have explained, any claim by Lasater that there was a true fiduciary relationship that was breached is not supported by law or by any allegation of fact in this case. Maryland does not recognize the relationship of husband and wife to be fiduciary in nature, and there is no evidence that Lasater can produce that she and Guttmann entered into an agreement creating a fiduciary relationship between them. Accordingly, we hold that, on the summary judgment record, Lasater cannot maintain a tort claim against Guttmann for breach of a true fiduciary duty.

■ We further hold that the facts Lasater alleged and attested to in opposition to Guttmann's motion for summary judgment can not, as a matter of law, support a reasonable finding of a confidential relationship between the two. The funds Lasater claims Guttmann mismanaged were deposited (or, with respect to Guttmann's income, should have been deposited) in the parties' Joint Checking Account or the Education Account. These accounts were in both parties' names. Regardless of where Guttmann put the monthly statements that came in the mail for those accounts, as an account holder, Lasater had access to all information about the accounts through the bank. And, money placed in a joint account is available for use by and for the benefit of both parties to the account. *Doe v. Doe*, 122 Md.App. 295, 357, 712 A.2d 132 (1998) (quoting opinion of the trial court to this effect), *rev'd on other grounds*, 358 Md. 113, 747 A.2d 617 (2000).

Lasater's allegations that Guttmann hid his mismanagement of the couple's finances and lied to her about the state of their finances concern these joint accounts only. Unlike the husband in the *Yousif* case, who maintained sole access to the spouses' assets, Guttmann shared access to the joint accounts

with Lasater, and therefore could not effectively hide his mismanagement of the money in those accounts or lie about the funds in them without Lasater's complicity. And, unlike the wife in *Hale*, Lasater is not a poorly educated and not very competent person who is not capable of handling financial matters, or understanding them. On the facts alleged by Lasater, taken in the light most favorable to her, she did not know the true circumstances about the money in the joint accounts and where it was being spent because she did not take advantage of the access to the accounts to which she was entitled, choosing instead to remain ignorant of the couple's finances. By her own admission, Lasater did not read the account statements that came in the mail and did not take any steps to obtain information about the accounts from the bank, which was obligated to give her any information she would seek.

Moreover, with respect to a confidential relationship, the facts that are not disputed or are as advocated by Lasater establish that she is in her 40's, is mentally stable, holds a law degree, worked for 20 years as a lawyer, both in law firms and in her own practice, and is not in ill health. None of these factors supports a finding of a confidential relationship. As to degree of dependence upon Guttmann, Lasater acknowledges that when she became disturbed by the state of the couple's finances, she "took over stewardship" of them. There are no facts offered by Lasater that are remotely of the sort as those in *Yousif* or *Hale* that would show that Guttmann exercised complete dominion over Lasater in any aspect of the marriage, including with respect to the couple's finances. Indeed, over and over in her affidavit, Lasater asserts that she trusted Guttmann completely with the family's finances because she loved him and did not think that he would mismanage their money to their, and her, detriment, and because he said things that made her feel guilty about not contributing to the family's finances herself. The blind love, hurt feelings, and other sometimes unfortunate emotions that spouses may experience are not a basis for a finding of a confidential relationship as the law knows it.

It also is important in considering the issue of a confidential relationship that Lasater did not make use of discovery in the divorce action to obtain information that she claims she does not have about what Guttmann wasted the couple's funds on. To the extent that he used marital money to purchase real estate, any such real estate would constitute marital property, and would be subject to equitable distribution. Moreover, Lasater's complaint that the doctrine of dissipation would not have aided her, because she could not have proven that Guttmann spent marital assets when the marriage was breaking down, for the purpose of keeping marital assets from her, is not relevant to the distribution of any existing marital assets, such as real property and the CD collection. To the extent Lasater could have shown that Guttmann engaged in wasting of marital assets, even if she could not prove dissipation, she could argue that his conduct was a factor that militated strongly in favor of an award to her of virtually all of the marital assets.

Finally, we hold that, even if a trier of fact crediting all of Lasater's allegations reasonably could find that she and Guttmann occupied a confidential relationship (which we do not think is the case) Lasater's claim nevertheless is not actionable under Maryland law. As we already have explained, the cases from Maryland and elsewhere in which there either is a presumption or a finding of a confidential or fiduciary relationship between spouses all concern the viability *vel non* of a particular transaction between the two. The central issue in those cases is whether the transaction in question will be set aside or will survive. The existence of a fiduciary or confidential relationship between the spouses affects what must be shown, and who must make the showing, to set the transaction aside.

In the case at bar, we are not dealing with a single transaction. We are not even dealing with a set of discrete transactions. Nor are we dealing with any transaction that is capable of being set aside. Rather, we are dealing with all the steps Guttmann took or did not take in managing the couple's

finances throughout the couple's marriage. Should Guttmann have spent the couple's money on the upkeep of the parties' Bethesda house instead of on CDs? Should he have invested money in the stock market instead of in real estate in the Carribean? To the extent any vehicle might exist to right these perceived wrongs, it would be an action for breach of a general duty of good faith between spouses, of the type created by statute in Wisconsin. There is no such cause of action in Maryland either by statute or common law, however.

For all these reasons, the circuit court properly granted summary judgment in favor of Guttmann on Lasater's breach of judiciary duty claim.

### (b)

### *Fraud*

Lasater's fraud claim is premised on essentially the same facts she asserted in support of her breach of fiduciary duty claim. The fraud claim never was pursued separately below and Lasater devotes less than one page of her brief to argument on this count.[21] In her amended complaint, she alleged that Guttmann misrepresented to her the state of their finances and "remained silent when there was a duty to speak [ ] about material matters relating to the couple's and Lasater's finances." According to Lasater, he fraudulently represented to her that he was using monies from their Joint Checking Account, and her own money, "for purposes directly related to the family's basic needs." He also misrepresented

---

21. In her reply brief, Lasater argues that Guttmann concedes that he did not move to dismiss her fraud count and that he moved for summary judgment as to this count only on the basis of limitations. In his motion for summary judgment, Guttmann argued that the facts alleged by Lasater in support of her claim of fraud "expose her complaint to be without legal merit." He further argued that she could not allow him to manage their finances "without question or oversight" and then claim fraud based on his failure to inform her of certain expenditures. Lastly, he contended that Lasater could not justifiably rely on the alleged misrepresentations because she had equal access to their joint marital funds. Thus, Lasater's assertion that Guttmann argued only limitations below is not supported by the record.

that he needed Lasater to pay, from her separate non-marital funds, his income taxes. Finally, she maintains that he failed to tell her, when he had a duty to do so, that he was making expenditures on real estate ventures; that he opened "at least one secret bank account"; and that he was otherwise spending the couple's joint funds for personal purposes.

We begin with Lasater's claim that Guttmann fraudulently concealed material facts from her regarding his expenditures and investments. As she recognizes, in order to prevail on such a claim, she must demonstrate that he owed her a duty to speak. *See Lloyd v. GM*, 397 Md. 108, 139, 916 A.2d 257 (2007) (element of claim of fraudulent concealment is that " 'the defendant owed a duty to the plaintiff to disclose a material fact' " (quoting *Green v. H & R Block*, 355 Md. 488, 525, 735 A.2d 1039 (1999))). According to Lasater, Guttmann's duty to disclose flowed from their confidential and/or fiduciary relationship. For the reasons discussed *supra*, we conclude that the facts put forth below, viewed in a light most favorable to Lasater, do not support a finding of such a relationship between the parties, as a matter of law. It follows that her fraudulent concealment action fails as a matter of law.

Turning to Lasater's claim premised on fraudulent misrepresentations made by Guttmann, the Court of Appeals has explained:

> In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660 (1994). Each element must be proved by clear and convincing evi-

dence. *Gourdine v. Crews,* 405 Md. 722, 758–59, 955 A.2d 769 (2008).

We begin by reviewing the misrepresentations Lasater asserts Guttmann made. They fall into three categories. The first category involves statements of blame. In her opposition to summary judgment, Lasater stated that Guttmann "affirmatively represented to her" that "any financial tightness they ever had before the children were born was because [she] did not earn as much as [he did]; that financial strain after the children were born was due to her not working; that she was to blame for their not being able to afford to maintain their home; and that the cost of a babysitter to watch the children while Lasater was working on her book was the cause of "financial tightness" in the summer of 2002. She further averred that, when she discovered the "huge equity debt against their home" in January of 2003 and asked Guttmann why he had not told her about it, he represented that he "didn't want [*her*] to know what [*she*] w[as] doing to our family." (Emphasis added.)

The second category of misrepresentations involves statements by Guttmann respecting his own income or earning power. According to Lasater, Guttmann stated that he could barely afford to pay the family's day-to-day living expenses on his salary, and that he had gone "of counsel" at his law firm and therefore did not receive year-end distributions.

The last category involves misrepresentation related to how Guttmann used the joint marital funds. Lasater claims that Guttmann falsely represented that he was depositing all of his earnings in their Joint Checking Account; that, in the summer of 2002, in response to her queries as to whether they could afford two "lavish" vacations he had arranged, Guttmann lied and said they could, even though he had borrowed against their home; and that, for several years, Guttmann misrepresented that he owned season tickets to the Redskins games when, in fact, he did not. Further, after Lasater "assumed stewardship of the family finances" in 2003, Guttmann represented to her that he was recording all of his expenditures in

their daily expense journal when, in fact, he was not. Finally, Guttmann lied to her about paying off his American Express card.

We conclude that, for several reasons, Lasater did not produce facts on the summary judgment record to support an actionable claim of fraud. First, the majority of representations in question were in the nature of opinions and are too vague to be actionable. "A statement that is 'vague and indefinite in its nature and terms'" cannot support a cause of action for fraud. *Goldstein v. Miles,* 159 Md.App. 403, 436, 859 A.2d 313 (2004) (quoting *Buschman v. Codd,* 52 Md. 202, 207 (1879)). *See also Parker v. Columbia Bank,* 91 Md.App. 346, 359–60, 604 A.2d 521 (1992) ("false representation" must be a misrepresentation of material fact, not an estimate, an opinion, or puffing). This is because such statements are deemed to put the party to whom they are made on inquiry notice to investigate further. *Goldstein, supra,* 159 Md.App. at 436, 859 A.2d 313.

All of Guttmann's statements blaming Lasater for their financial difficulties were statements of opinion that cannot form the basis of an action for fraud.[22] A husband and wife are likely to disagree at many times as to which party contributes more, financially and otherwise, to the marriage. Guttmann's statements that Lasater's decision not to work outside the home or her decision to hire a babysitter to watch the children while she worked on her book were causing the family's financial problems reflect his opinion that, were she earning an income, the family would have had more spending power. Whether Guttmann was spending well beyond their means or not, Lasater's lack of income was a factor in their financial situation. His opinion on this matter cannot be deemed a false representation of material fact. Similarly, his

---

22. The statements also are arguably immaterial. *See* 2 Fowler V. Harper, *et al.,* HARPER, JAMES & GRAY ON TORTS § 7.9 at 516–17 (3d ed.2006) ("Where the fact represented would not influence the reasonable person, either because of its triviality or because of its irrelevance to the subject dealt with, the law will ordinarily regard that fact as immaterial and reliance on it unjustified." (footnotes omitted)).

statement that they could afford a vacation in the summer of 2002 is not a false representation. It merely represents a difference of opinion as to whether borrowing against their home was an acceptable means to pay for a family vacation.

For related reasons, even the alleged misrepresentations that would qualify as statements of material fact do not support a cause of action in fraud because Lasater could not reasonably have relied upon the statements. This Court has explained that, "[i]n determining if reliance is reasonable, a court is required to 'view the act in its setting[.]' " *Parker, supra,* 91 Md.App. at 361–62, 604 A.2d 521 (quoting *Giant Food, Inc. v. Ice King, Inc.,* 74 Md.App. 183, 192, 536 A.2d 1182 (1988)). In the instant case, the "setting" is a marriage between two educated and intelligent parties with equal access to all of the information about their joint finances.

Lasater asserts that she reasonably relied on Guttmann's alleged false statements about his level of income and his inability to afford to pay for his income taxes and their day to day living expenses on his income alone. As a fellow attorney with at least 20 years of experience in the legal world, Lasater could not have reasonably relied upon her husband's statements to this effect. Moreover, she was not free to rely on these statements when their falsity was obvious and she was able to discover the truth simply by opening one of the hundreds of bank statements sent to their home over the years or from a cursory review of their joint tax returns. *See* RESTATEMENT (SECOND) OF TORTS § 541, Comment (a) (1977) (recipient of a fraudulent misrepresentation is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."); *see also* 2 HARPER, JAMES AND GRAY ON TORTS, *supra,* § 7.12 at 544 ("If a statement is patently preposterous in the light of common knowledge or if it would be shown up as false on the most casual inspection immediately available to the recipient," reliance upon it is not justified as a matter of law (footnotes omitted)).

It also is difficult to reconcile certain of the alleged misrepresentations made by Guttmann. Lasater maintains that, at times, Guttmann falsely represented that their finances were secure and, at other times, falsely represented that it was her fault that their finances were strained. For example, according to Lasater, in the summer of 2002, Guttmann was simultaneously telling her that they could not afford a babysitter for their children and that they could afford two "lavish vacations" to Florida and the Caribbean.[23] It is inconceivable that Lasater could simultaneously have been acting in justifiable reliance upon two contradictory misrepresentations and suffering damages flowing from such reliance.

With respect to damages flowing from reliance on Guttmann's representations, Lasater does not assert, with certain limited exceptions,[24] how she would have acted differently had Guttmann not made the allegedly false statements. We confronted a similar situation in *Doe v. Doe, supra,* 122 Md.App. at 295, 712 A.2d 132, when this Court considered whether a husband could maintain a tort suit against his wife for, *inter alia,* fraud. The husband's claims were premised on two sets of fact. First, the husband alleged that his wife defrauded him by falsely representing that he was the father of their three children and/or not disclosing that another man was the

---

23. In another example, Lasater complains that, when she was practicing law early in the marriage, Guttmann continually told her that she did not earn as much as he did, making her "feel bad and ashamed that [she] did not earn the *big law firm salary* he did." (Emphasis added.) Yet, she simultaneously contends she justifiably relied on his representations years later that he was not earning enough money to support their family.

24. Lasater did aver in opposition to summary judgment that, "because of [Guttmann's] frauds and diversion of our assets," the marital home was not maintained or renovated. As discussed, *supra,* the marital home was sold in 2007 for $650,000, just $200,000 more than the couple paid for it more than eighteen years prior. The purchaser, a real estate developer, then made repairs and renovations and resold the property for $1,150,000 "in a matter of weeks." It is noteworthy that in her opposition Lasater gave no reason why she could not have used her personal funds in the Inheritance Account to maintain the marital home so as to prevent waste of an obviously valuable marital asset.

father. Second, the husband alleged that his wife defrauded him by falsely representing that, upon retirement, he could rely upon her stockholdings for income. In reliance upon this promise, he deposited his entire income into the couple's joint checking account and did not contribute to his 401(k) plan.

In the circuit court, the husband's fraud claims both were dismissed for failure to state a claim for which relief could be granted. On appeal to this Court, we reversed the dismissal of the fraud claim premised on the paternity of the children, but affirmed dismissal of the fraud claim premised on financial misrepresentations.[25] In affirming the dismissal of the latter claim, we quoted the trial court's ruling in the circuit court:

> Marriage contemplates numerous promises for the future. . . . Promises made with regard to the future (including those of a financial nature) may not be binding in the event the parties no longer have a future together. . . . Moreover, it was a mutual decision between the parties that Plaintiff would not contribute to his 401 [ (k) ] retirement plan. The money was placed in a joint checking account— available for use by and for the benefit of both parties. The Defendant did not obtain use of those funds without Plaintiff's complicity.

*Id.* at 357, 712 A.2d 132.

We upheld the circuit court's ruling, reasoning that the husband had failed to allege with adequate specificity the fraudulent representations made by his wife and damages suffered in reliance upon them. His assertion that she falsely promised that he could rely on her stockholdings was insufficient when he failed to allege the nature of her stockholdings or how much money he would have invested in his 401(k) plan

---

**25.** The Court of Appeals granted a writ of *certiorari* on the limited issue of whether Maryland recognizes a tort action for fraud or intentional infliction of emotional distress based upon a wife's alleged adultery and subsequent misrepresentations concerning the paternity of children born during the marriage. 358 Md. 113, 747 A.2d 617. It held that no such action could be maintained. *Id.*

absent her promise. Thus, both the reasonableness of his reliance and any alleged damages were purely speculative.

In the instant case, Lasater also has not alleged damages with adequate specificity. Would she have declined to take the "lavish vacation" had she known the couple had to borrow against the home? Would she have continued working on her book instead of taking over care of the children had she known it was Guttmann's alleged overspending, not the cost of the babysitter, causing their financial difficulties? How would she have spent or invested the couple's joint income had she not been ignorant of their financial dealings?

Finally, as discussed, *supra*, evidence of wasteful or imprudent conduct by one spouse with respect to marital finances properly may be considered in the context of a divorce proceedings as a factor weighing in favor of awarding most, if not all, of the marital property to the non-offending spouse. *See* Md.Code (2006 Repl.Vol., 2009 Supp.) §§ 8–205(b)(1), (3) & (11) of the Family Law Article (factors the court shall consider in adjusting the equities include contributions made by each party to the well-being of the marriage; circumstances leading to the estrangement of the parties; and any other factor necessary and appropriate in reaching a fair and equitable result). It is for this reason that, even if we were to conclude that Guttmann's statements were actionable, that Lasater reasonably could rely on them, and that damages could be proved as a policy matter, we simply cannot countenance separate tort actions for fraud by one spouse against the other premised on statements regarding expenditures of joint marital funds.[26] The parties to a marriage bring with them differing views of necessary and discretionary expenditures.[27]

---

26. As discussed, *supra*, with respect to the breach of fiduciary duty claim, there are circumstances under which particular transactions between spouses possibly could give rise to a claim for fraud. We speak only to the types of allegations present here, where the asserted fraud was that Guttmann overspent marital funds and lied about it.

27. For example, Lasater averred below that Guttmann repeatedly told her that the marital home's state of disrepair "bother[ed her] more than

They may be comfortable with differing levels of investment risk. And despite those differences, both parties bear the responsibility for managing joint finances and bear the risk that the other spouse will spend marital funds in a manner not to their liking. We decline to open the door to tort suits arising from disagreements over allocation of marital resources when these grievances properly can be remedied in the divorce setting. *See, e.g., Beers, supra,* 724 So.2d at 116–17 (exclusive remedy for waste of marital assets is in the divorce proceedings).[28]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

it bother[ed him]." While she contends that this was one more misrepresentation intended to end discussion of why they couldn't afford to invest money in their home, it also could be a true statement of Guttmann's views on the matter. This is one of many areas where married couples may disagree.

**28.** Lasater also argues on appeal that it was error for the circuit court to deny her cross-motion for summary judgment. For the same reasons discussed above with respect to her breach of fiduciary duty and fraud claims, her cross-motion properly was denied.